# CANNON *v.* UNIVERSITY OF CHICAGO ET AL.

No. 77–926.  Argued January 9, 1979—Decided May 14, 1979

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, and REHNQUIST, JJ., joined. REHNQUIST, J., filed a concurring opinion, in which STEWART, J., joined, *post*, p. 717. BURGER, C. J., concurred in the judgment. WHITE, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 718. POWELL, J., filed a dissenting opinion, *post*, p. 730.

*John M. Cannon* argued the cause and filed briefs for petitioner.

*Solicitor General McCree* argued the cause for the federal respondents. With him on the briefs were *Assistant Attorney General Days, Deputy Solicitor General Wallace, Jessica Dunsay Silver,* and *Miriam R. Eisenstein.*

*Stuart Bernstein* argued the cause for respondents University of Chicago et al. With him on the brief were *Susan S. Sher* and *Thomas H. Morsch.**

---

* Briefs of *amici curiae* urging reversal were filed by *Nancy Duff Campbell* and *Margaret A. Kohn* for the Federation of Organizations for Professional Women et al.; by *Carla A. Hills, William C. Kelly, Jr., Charles A. Bane, Thomas D. Barr, Norman Redlich, Robert A. Murphy,* and *Norman J. Chachkin* for the Lawyers' Committee for Civil Rights Under Law; by *Kent Hull* for the National Center for Law and the Handicapped, Inc., et al.; and by *Howard C. Westwood, Peter J. Nickles, Arnold Forster, Jeffrey P. Sinensky, Samuel Rabinove, Peter D. Roos, Richard A. Weisz, Roger S. Kuhn, William L. Taylor, Ronald B. Brown, Robert Hermann,* and *Nathaniel Jones* for the National Urban League et al.

Briefs of *amici curiae* urging affirmance were filed by *Laura Christian Ford* and *Joseph Anthony Keyes, Jr.,* for the American Council on Education et al.; by *Susan A. Cahoon, William A. Wright,* and *Douglas S. McDowell* for the Equal Employment Advisory Council; and by *John W. Barnett* and *Noel E. Hanf* for Yale University.

MR. JUSTICE STEVENS delivered the opinion of the Court.

Petitioner's complaints allege that her applications for admission to medical school were denied by the respondents because she is a woman.[1]   Accepting the truth of those allegations for the purpose of its decision, the Court of Appeals held that petitioner has no right of action against respondents that may be asserted in a federal court.   559 F. 2d 1063.   We granted certiorari to review that holding.   438 U. S. 914.

Only two facts alleged in the complaints are relevant to our decision.   First, petitioner was excluded from participation in the respondents' medical education programs because of her sex.   Second, these education programs were receiving federal financial assistance at the time of her exclusion.   These facts, admitted *arguendo* by respondents' motion to dismiss the complaints, establish a violation of § 901 (a) of Title IX of the Education Amendments of 1972 (hereinafter Title IX).[2]

---

[1] Each of petitioner's two complaints names as defendant a private university—the University of Chicago and Northwestern University—and various officials of the medical school operated by that university.   In addition, both complaints name the Secretary, and the Region V Director of the Office for Civil Rights, of the Department of Health, Education, and Welfare.   Although all of these defendants prevailed below, and are respondents here, the federal defendants have taken a position that basically accords with the position advanced by petitioner.   See Brief for Federal Respondents.   Unless otherwise clear in context, all references to respondents in this opinion will refer to the private defendants named in petitioner's complaints.

[2] Petitioner's complaints allege violations of various federal statutes including Title IX.   Although the District Court and Court of Appeals ruled adversely on all of these theories, petitioner confined her petition for a writ of certiorari to the Title IX question.   Pet. for Cert. 3.   On that question, the District Court and Court of Appeals ruled favorably on respondents' motion to dismiss the complaints for failure to state a cause of action.   See App. 22.   Although respondents sought summary judgment simultaneously with their motion to dismiss, and submitted supporting affidavits, the courts below did not purport to rule on summary judgment or to make factual findings.   Accordingly, all of the facts alleged

That section, in relevant part, provides:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the

in petitioner's complaints must be taken as true for purposes of review.

According to her complaints, petitioner was qualified to attend both of the respondent medical schools based on both objective (*i. e.*, grade-point average and test scores) and subjective criteria. In fact, both schools admitted some persons to the classes to which she applied despite the fact that those persons had less impressive objective qualifications than she did. *Id.*, at 6–7, 12–13.

Both medical schools receive federal aid, *id.*, at 15–16, and both have policies against admitting applicants who are more than 30 years old (petitioner was 39 years old at the time she applied), at least if they do not have advanced degrees. *Id.*, at 7. Northwestern Medical School absolutely disqualifies applicants over 35. *Id.*, at 7 n. 3. These policies, it is alleged, prevented petitioner from being asked to an interview at the medical schools, so that she was denied even the opportunity to convince the schools that her personal qualifications warranted her admission in place of persons whose objective qualifications were better than hers. *Id.*, at 10, and n. 4, 11–12. Because the incidence of interrupted higher education is higher among women than among men, it is further claimed, the age and advanced-degree criteria operate to exclude women from consideration even though the criteria are not valid predictors of success in medical schools or in medical practice. *Id.*, at 7–11. As such, the existence of the criteria either makes out or evidences a violation of the medical school's duty under Title IX to avoid discrimination on the basis of sex. *Id.*, at 13. Petitioner also claimed that the schools accepted a far smaller percentage of women than their percentage in the general population and in the class of persons with bachelor's degrees. *Id.*, at 9. But cf. 559 F. 2d 1063, 1067, referring to statistics submitted by the University of Chicago in its affidavit accompanying its summary judgment motion indicating that the percentage of women admitted to classes from 1972 to 1975, 18.3%, was virtually identical to the percentage of women applicants. Of course, the dampening impact of a discriminatory rule may undermine the relevance of figures relating to *actual* applicants. See *Dothard* v. *Rawlinson*, 433 U. S. 321, 330.

Upon her rejection by both schools, petitioner sought reconsideration of the decisions by way of written and telephonic communications with admissions officials. Finding these avenues of no avail, she filed a complaint with the local office of HEW in April 1975, alleging, *inter alia*,

benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." [3]

violations of Title IX. App. 16. Three months later, having received only an acknowledgment of receipt of her letter from HEW, petitioner filed suit in the District Court for the Northern District of Illinois against the private defendants. After she amended her complaints to include the federal defendants and requested injunctive relief ordering them to complete their investigation, she was informed that HEW would not begin its investigation of her complaint until early 1976. 559 F. 2d, at 1068, and n. 3; App. 49. In June 1976, HEW informed petitioner that the local stages of its investigation had been completed but that its national headquarters planned to conduct a further "in-depth study of the issues raised" because those issues were "of first impression and national in scope." App. to Pet. for Cert. A–35. As far as the record indicates, HEW has announced no further action in this case. See 559 F. 2d, at 1077.

[3] In relevant part, § 901, 86 Stat. 373, as amended, as set forth in 20 U. S. C. § 1681, provides:

"(a) . . . No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

"(1) . . . in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

"(2) . . . in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Commissioner of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Commissioner of Education, whichever is the later;

"(3) . . . this section shall not apply to an educational institution which

The statute does not, however, expressly authorize a private right of action by a person injured by a violation of § 901. For that reason, and because it concluded that no private remedy should be inferred, the District Court granted the respondents' motions to dismiss. 406 F. Supp. 1257, 1259.

The Court of Appeals agreed that the statute did not contain an implied private remedy. Noting that § 902 of Title IX establishes a procedure for the termination of federal financial support for institutions violating § 901, the Court of Appeals concluded that Congress intended that remedy to

---

is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

"(4) . . . this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine; [and]

"(5) . . . in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex.

. . . . .

"(b) . . . Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided,* That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

"(c) . . . For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department."

684

be the exclusive means of enforcement.[4]  It recognized that the statute was patterned after Title VI of the Civil Rights

---

[4] Section 902, 86 Stat. 374, as set forth in 20 U. S. C. § 1682, provides:

"Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.  No such rule, regulation, or order shall become effective unless and until approved by the President.  Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.  In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action.  No such action shall become effective until thirty days have elapsed after the filing of such report."

Section 903 of Title IX, 86 Stat. 374, as set forth in 20 U. S. C. § 1683, provides for judicial review of actions taken under § 902:

"Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.  In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a

Act of 1964 (hereinafter Title VI),[5] but rejected petitioner's argument that Title VI included an implied private cause of action. 559 F. 2d, at 1071–1075.

After the Court of Appeals' decision was announced, Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, which authorizes an award of fees to prevailing private parties in actions to enforce Title IX.[6] The

---

finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title."

[5] Section 601 of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d, provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

[6] The Civil Rights Attorney's Fees Awards Act of 1976 amended 42 U. S. C. § 1988. That section, in relevant part, provides:

". . . In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX [of the Education Amendments of 1972], or in any civil action or proceedings, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Respondents have argued that the amendment to § 1988 was merely intended to allow attorney's fees to the prevailing party in actions brought under the express provision in Title IX, 20 U. S. C. § 1683, quoted in n. 4, *supra,* authorizing alleged discriminators to obtain judicial review of Government decisions to cut off federal funds. See 559 F. 2d, at 1078. The legislative history of § 1988, as amended, belies this argument. The provision was clearly intended, *inter alia,* to allow awards of fees on behalf of "private" victims of discrimination who have successfully brought suit in court where authorized by the enumerated statutes:

"All of these civil rights laws [referred to in § 1988] depend heavily upon

court therefore granted a petition for rehearing to consider whether, in the light of that statute, its original interpretation of Title IX had been correct. After receiving additional briefs, the court concluded that the 1976 Act was not intended to create a remedy that did not previously exist.[7] The court

_private_ enforcement, and fee awards have proved an essential remedy if _private_ citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S. Rep. No. 94–1011, p. 2 (1976) (emphasis added).

Furthermore, the attorney's fee amendment passed in 1976 was designed to expand the availability of § 718 of the Education Amendments of 1972, 20 U. S. C. § 1617, quoted in n. 25, _infra,_ which unequivocally provides fees to litigants "other than the United States" who secure judicial relief against certain defendants for discrimination in violation of Title VI. Hence, although the language in §§ 718 and 1988 is not parallel, it appears that both authorize attorney's fees to certain private plaintiffs where the specified statute itself authorizes the relief sought by that plaintiff and the plaintiff proves his entitlement to such relief.

[7] We find nothing objectionable in this conclusion, as far as it goes. The legislative history quoted in the opinion of the Court of Appeals makes clear that the supporters of the legislation did not intend it to amend Title IX to include an express cause of action where none existed before. Instead, they clearly only meant to provide attorney's fees in the event that that statute as it had always existed implicitly created a cause of action. 559 F. 2d, at 1079–1080.

On the other hand, the language added to § 1988 by the 1976 amendment, and the legislative history surrounding it, do indicate that many "members of Congress may have assumed that private suits were authorized under" Title IX, 559 F. 2d, at 1079, and, more importantly, that many Members felt that private enforcement of Title IX was entirely consistent with, and even necessary to, the enforcement of Title IX and the other statutes listed in § 1988. In addition to reflecting this sentiment in the Senate Report on the 1976 amendment, see n. 6, _supra,_ numerous legislators said as much on the floor of the two Houses:

"It is Congress['] obligation to enforce the 14th amendment by eliminating entirely such forms of discrimination, and that is why both title VI of the Civil Rights Act of 1964 and title IX of the Education Amendments of 1972 have been included [in the amendment to § 1988]. As basic provisions of the civil rights enforcement scheme that Congress has created, it is essential that private enforcement be made possible by authorizing

also noted that the Department of Health, Education, and Welfare had taken the position that a private cause of action under Title IX should be implied,[8] but the court disagreed

attorneys' fees in this essential area of the law." 122 Cong. Rec. 31472 (1976) (remarks of Sen. Kennedy).

See also *id.*, at 31471 (Sen. Scott); *id.*, at 31482 (Sen. Allen); *id.*, at 31832 (Sen. Hathaway); *id.*, at 33313 (Sen. Tunney); *id.*, at 33314 (Sen. Abourezk); *id.*, at 35122 (Rep. Drinan); *id.*, at 35125–35126 (Rep. Kastenmeier); *id.*, at 35127 (Rep. Holtzman); *id.*, at 35128 (Rep. Seiberling).

Although we cannot accord these remarks the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX and its place within "the civil rights enforcement scheme" that successive Congresses have created over the past 110 years.

[8] At least since September 17, 1974, HEW has taken the position that an implied cause of action does exist under Title IX in certain circumstances. Letter from HEW Assistant General Counsel Theodore A. Miles to Dr. Bernice Sandler (Sept. 17, 1974), reproduced in App. to Pet. for Cert. A–36 to A–38. See also Memorandum for United States as *Amicus Curiae* in *Lau* v. *Nichols*, O. T. 1973, No. 72–6520, p. 13 n. 5, in which the Justice Department on behalf of HEW took the position that an implied cause of action exists under Title VI; n. 31, *infra*. It is represented that "communication lapses between national and regional HEW offices" accounted for HEW's taking the contrary position throughout the early stages of this suit and until petitioner asked for rehearing before the Seventh Circuit. Brief for Federal Respondents 6 n. 9.

HEW's position on the interaction between the private cause of action that it recognizes and the administrative remedy provided by 20 U. S. C. § 1682 and HEW regulations was less clear until recently. In the Assistant General Counsel's 1974 letter mentioned above, the question of exhaustion of administrative remedies was raised but not answered. Since 1974, HEW has apparently never taken the position that exhaustion is required in every case. In submissions made to the Court in *Terry* v. *Methodist Hospital*, Civ. No. 76–373 (ND Ind.), however, the Department apparently took the position that it should always have the *opportunity* (*i. e.*, "primary jurisdiction") to exercise its expertise through the § 1682 process in advance of judicial consideration of a private suit. Statement in Support of HEW's Motion for Reconsideration, Oct. 13, 1977, pp. 6, 10. It was apparently contemplated that the administrative results would be due some amount of deference in subsequent private litigation. Later, HEW

with that agency's interpretation of the Act. In sum, it adhered to its original view, 559 F. 2d, at 1077–1080.

The Court of Appeals quite properly devoted careful attention to this question of statutory construction. As our recent cases—particularly *Cort* v. *Ash*, 422 U. S. 66—demonstrate, the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person. Instead, before concluding that Congress intended to make a remedy available to a special class of litigants, a court must carefully analyze the four factors that *Cort* identifies as indicative of such an intent.[9] Our review of those factors persuades us, however,

---

advanced the position that the choice lay with the alleged victim of discrimination, but that if that person initiated administrative proceedings prior to suit (as petitioner did here), the only judicial remedy would be through judicial review of the agency action. See *NAACP* v. *Wilmington Medical Center,* 453 F. Supp. 280, 300 (Del. 1978). Now, however, HEW, in conjunction with the Department of Justice, has rejected any strict-exhaustion, primary-jurisdiction, or election-of-remedies position in favor of a more flexible approach. In its view, a district court might choose to defer to the decision of the relevant administrative agency, if, unlike here, one has been reached in advance of trial, and it may wish to stay its hand upon request of HEW if an administrative investigation or informal negotiations are in progress and might be hampered by judicial action. See Brief for Federal Respondents 58–60, n. 36.

[9] "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39 (1916) (emphasis supplied)— that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458, 460 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412, 423 (1975); *Calhoon* v. *Harvey,* 379 U. S. 134 (1964). And finally, is the cause of action one traditionally relegated to state law,

that the Court of Appeals reached the wrong conclusion and that petitioner does have a statutory right to pursue her claim that respondents rejected her application on the basis of her sex. After commenting on each of the four factors, we shall explain why they are not overcome by respondents' countervailing arguments.

I

*First,* the threshold question under *Cort* is whether the statute was enacted for the benefit of a special class of which the plaintiff is a member. That question is answered by looking to the language of the statute itself. Thus, the statutory reference to "any employee of any such common carrier" in the 1893 legislation requiring railroads to equip their cars with secure "grab irons or handholds," see 27 Stat. 532, 531, made "irresistible" the Court's earliest "inference of a private right of action"—in that case in favor of a railway employee who was injured when a grab iron gave way. *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 40.[10]

---

in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin* v. *Wheeler,* 373 U. S. 647, 652 (1963); cf. *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 434 (1964); *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 394–395 (1971); *id.,* at 400 (Harlan, J., concurring in judgment)." 422 U. S., at 78.

[10] In that case the Court stated:

"A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law expressed in 1 Com. Dig., *tit.* Action upon Statute (F), in these words: 'So, in every case, where a statute enacts, or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said law.' (*Per* Holt, C. J., *Anon.,* 6 Mod. 26, 27.) This is but an application of the maxim, *Ubi jus ibi remedium.* See 3 Black. Com. 51, 123; *Couch* v. *Steel,* 3 El. & Bl. 402, 411; 23 L. J. Q. B. 121, 125." 241 U. S., at 39–40.

Similarly, it was statutory language describing the special class to be benefited by § 5 of the Voting Rights Act of 1965 [11] that persuaded the Court that private parties within that class were implicitly authorized to seek a declaratory judgment against a covered State. *Allen* v. *State Board of Elections,* 393 U. S. 544, 554–555.[12] The dispositive language in that statute—"no person shall be denied the right to vote for failure to comply with [a new state enactment covered by, but not approved under, § 5]"—is remarkably similar to the language used by Congress in Title IX. See n. 3, *supra.*

The language in these statutes—which expressly identifies the class Congress intended to benefit—contrasts sharply with statutory language customarily found in criminal statutes, such as that construed in *Cort, supra,* and other laws enacted for the protection of the general public.[13] There would be far

---

[11] 42 U. S. C. § 1973c.

[12] The Court's entire explanation for inferring a private remedy was as follows:

"The Voting Rights Act does not explicitly grant or deny private parties authorization to seek a declaratory judgment that a State has failed to comply with the provisions of the Act. However, § 5 does provide that 'no person shall be denied the right to vote for failure to comply with [a new state enactment covered by, but not approved under, § 5].' Analysis of this language in light of the major purpose of the Act indicates that appellants may seek a declaratory judgment that a new state enactment is governed by § 5." 393 U. S., at 554–555 (footnotes omitted).

[13] Not surprisingly, the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action. With the exception of one case, in which the relevant statute reflected a special policy against judicial interference, this Court has never refused to imply a cause of action where the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case. See *Sullivan* v. *Little Hunting Park,* 396 U. S. 229, 238 (42 U. S. C. § 1982: "All citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof . . ."); *Allen* v. *State Board of Elections,* 393 U. S. 544 (42 U. S. C. § 1973c: "no person shall be denied the right to vote . . ."); *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 414–415, and n. 13 (same as in

less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX with an unmistakable focus on the benefited class, had written it simply

---

*Sullivan, supra*); *Tunstall* v. *Locomotive Firemen & Enginemen,* 323 U. S. 210, 213 (§ 2 Fourth of the Railway Labor Act: "Employees shall have the right to organize and bargain collectively through representatives . . ."); *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 199 (same); *Virginian R. Co.* v. *Railway Employees,* 300 U. S. 515, 545 (§ 2 Ninth of the Railway Labor Act: "the carrier shall treat with the *representative* so certified" (emphasis added)); *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548, 567–570 (§ 2 Third of the Railway Labor Act: "Representatives . . . shall be designated by the respective *parties* . . . without interference, influence, or coercion exercised by either party . . ." (emphasis added)); *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 40 (27 Stat. 532: "any employee of any such common carrier"). Analogously, the Court has implied causes of action in favor of the United States in cases where the statute creates a duty in favor of the public at large. See *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191, 200–202 (33 U. S. C. § 409: "It shall not be lawful [to obstruct navigable waterways]"); *United States* v. *Republic Steel Corp.,* 362 U. S. 482 (same).

The only case that deviates from this pattern is *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, which involved Title I of the Indian Civil Rights Act of 1968, 25 U. S. C. § 1302 (8): "No Indian tribe . . . shall deny to any person within its jurisdiction the equal protection of its laws." *Martinez,* however, involved an attempt to imply a cause of action in a virtually unique situation—*i. e.,* against an Indian tribe, protected by a strong presumption of autonomy and self-government, as well as by a special duty on the part of the Federal Government to deal fairly and openly, and by a legislative history indicative of an intent to limit severely judicial interference in tribal affairs. 436 U. S., at 55, 58–59, 63–64, 67–70, and n. 30. In this situation, the fourth *Cort* factor was brought into special play. The *Martinez* Court determined that the strong presumption against implication of federal remedies where they might interfere with matters "traditionally relegated to state law," *Cort,* 422 U. S., at 78, was equally applicable in circumstances where the federal remedies would interfere with matters traditionally relegated to the control of semisovereign Indian tribes.

Even *Martinez,* however, "recognized the propriety of inferring a federal cause of action for the enforcement of civil rights, even when Congress has spoken in purely declarative terms." 436 U. S., at 61; see *Sullivan* v.

as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public

*Little Hunting Park, supra,* at 238; *Allen* v. *State Board of Elections, supra; Jones* v. *Alfred H. Mayer Co., supra,* at 414 n. 13. This principle, which is directly applicable in the present Title IX context, is but a manifestation of the pattern noted above because a statute declarative of a civil right will almost have to be stated in terms of the benefited class. Put somewhat differently, because the right to be free of discrimination is a "personal" one, see, *e. g., Teamsters* v. *United States,* 431 U. S. 324, 361–372; *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 772, a statute conferring such a right will almost have to be phrased in terms of the persons benefited.

Conversely, the Court has been especially reluctant to imply causes of actions under statutes that create duties on the part of persons for the benefit of the public at large. See *Piper* v. *Chris-Craft Industries,* 430 U. S. 1 ("unlawful" conduct); *Cort* v. *Ash, supra* ("unlawful" conduct); *Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412 (duty of SIPC to "discharge its obligations"); *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453 (forbidding "action, practice, or policy inconsistent" with the Amtrak Act); *Wheeldin* v. *Wheeler,* 373 U. S. 647 (setting procedure for procuring congressional subpoena); *T. I. M. E. Inc.* v. *United States,* 359 U. S. 464 ("duty of every common carrier . . . to establish . . . just and reasonable rates . . ."); *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.,* 341 U. S. 246 (similar duty of gas pipeline companies). The Court has deviated from this pattern on occasion. See *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (implying a cause of action under a securities provision describing "unlawful" conduct); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 13 n. 9 (implying a cause of action under Securities and Exchange Commission Rule 10b–5, which describes certain unlawful manipulative conduct in the securities area); *Machinists* v. *Central Airlines,* 372 U. S. 682 (implied cause of action under section of the Railway Labor Act creating a "duty" on the part of common carriers to establish boards of adjustment). At least the latter two cases can be explained historically, however. In *Superintendent of Insurance,* the Court explicitly acquiesced in the 25-year-old acceptance by the lower federal courts of a Rule 10b–5 cause of action. See also *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 196; *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 730. In *Machinists,* the Court explicitly followed the lead of various earlier cases in which it had implied causes of actions under various sections of the Railway Labor Act, albeit where the statutory provisions more explicitly

funds to educational institutions engaged in discriminatory practices.[14]

Unquestionably, therefore, the first of the four factors identified in *Cort* favors the implication of a private cause of

---

identified a class of benefited persons. See *Tunstall, supra; Steele, supra; Virginian R. Co., supra; Texas & N. O. R. Co., supra.*

[14] In adopting Title IX in its present form, in fact, Congress passed over an alternative proposal, offered by Senator McGovern as an amendment to the Higher Education Act of 1965, that was phrased quite differently—as a simple directive to the Secretary of HEW:

"PROHIBITION AGAINST SEX DISCRIMINATION

"Sec. 1206. (a) The Secretary shall not make any grant, loan guarantee, or interest subsidy payment, nor shall the Secretary enter into any contract with any institution of higher education, or any other postsecondary institution, center, training center, or agencies representing such institutions unless the application, contract, or other arrangement for the grant, loan guarantee, interest subsidy payment, or other financial assistance contains assurances satisfactory to the Secretary that any such institution, center, or agency will not discriminate on the basis of sex in the admission of individuals to any program to which the application, contract, or other arrangement is applicable." 117 Cong. Rec. 30411 (1971).

In this connection, it is also interesting to note that as originally introduced Title VI of the Civil Rights Act of 1964, after which Title IX was explicitly patterned, see n. 16, *infra,* was also phrased as a directive to federal agencies engaged in the disbursement of public funds:

"TITLE VI—NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS

"Sec. 601. Notwithstanding any provision to the contrary in any law of the United States providing or authorizing direct or indirect financial assistance for or in connection with any program or activity by way of grant, contract, loan, insurance, guaranty, or otherwise, no such law shall be interpreted as requiring that such financial assistance shall be furnished in circumstances under which individuals participating in or benefiting from the program or activity are discriminated against on the ground of race, color, religion, or national origin or are denied participation or benefits therein on the ground of race, color, religion, or national origin. All contracts made in connection with any such program or activity shall contain such conditions as the President may prescribe for the purpose of assuring that there shall be no discrimination in employment by any

action. Title IX explicitly confers a benefit on persons discriminated against on the basis of sex, and petitioner is clearly a member of that class for whose special benefit the statute was enacted.

*Second,* the *Cort* analysis requires consideration of legislative history. We must recognize, however, that the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question. Therefore, in situations such as the present one "in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to *deny* such cause of action would be controlling." *Cort,* 422 U. S., at 82 (emphasis in original).[15] But this is not the typical case. Far from evidencing any purpose to *deny* a private cause of action, the history of Title IX rather plainly indicates that Congress intended to create such a remedy.

Title IX was patterned after Title VI of the Civil Rights Act of 1964.[16] Except for the substitution of the word "sex"

---

contractor or subcontractor on the ground of race, color, religion, or national origin." S. 1731, 88th Cong., 1st Sess. (1963).

After Senators Keating and Ribicoff raised objections to the bill on the ground that it did not expressly authorize a private remedy for a person against whom discrimination had been practiced, the Department of Justice submitted a revised bill which contained the language now found in § 601. See Hearings before the Senate Committee on the Judiciary on S. 1731 and S. 1750, 88th Cong., 1st Sess., 334–335, 349–352 (1963); *infra,* at 713–716.

[15] See also *Santa Clara Pueblo* v. *Martinez,* 436 U. S., at 79 (WHITE, J., dissenting).

[16] "This is identical language, specifically taken from title VI of the 1964 Civil Rights Act . . . ." 117 Cong. Rec. 30407 (1971) (Sen. Bayh—Senate sponsor). Accord, *id.,* at 30408 ("We are only adding the 3-letter word 'sex' to existing law") (Sen. Bayh); *id.,* at 39256 (Rep. Green—House sponsor); 118 Cong. Rec. 5803, 5807, 18437 (1972) (Sen. Bayh).

The genesis of Title IX also bears out its kinship with Title VI. In

in Title IX to replace the words "race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefited class.[17] Both statutes provide the

the summer of 1970, Representative Edith Green of Oregon, who later sponsored Title IX on the floor of the House during the debates in 1971 and 1972, chaired a set of hearings on "Discrimination Against Women." Hearings before the Special Subcommittee on Education of the House Committee on Education and Labor on § 805 of H. R. 16098, 91st Cong., 2d Sess. (1970). Under consideration was a section of a pending bill, H. R. 16098, that would simply have added the word "sex" to the list of discriminations prohibited by § 601 of Title VI. See Hearings, *supra*, at 1. During the course of the hearings, which were repeatedly relied upon in both Houses during the subsequent debates on Title IX, it became clear that educational institutions were the primary focus of complaints concerning sex discrimination. See, *e. g.*, *id.*, at 5, 237, 584. In order to conform to that focus, and in order to respond to criticism that certain federally funded programs were properly operating on a single-sex basis (for example, undergraduate colleges and homes for disturbed children), witnesses at the hearings, including representatives of the Justice Department and of the United States Commission on Civil Rights, proposed that a special provision be drawn up that was parallel to, but somewhat more limited than, Title VI. *Id.*, at 664–666, 677–678, 690–691.

Although H. R. 16098 never made it through the House, its sex discrimination provision was lifted from it, modified along the lines suggested in the 1970 hearings, and included in the House Resolution that was amended and adopted by the House as its version of what became the Education Amendments of 1972. H. R. 32, 92d Cong., 1st Sess., Title X. Of note here, this House proposal was originally phrased as an amendment to Title VI that would have made § 601 of that Title into § 601 (a), and would have added the gist of what is now Title IX as § 601 (b). H. R. 32, *supra*. After further modifications not relevant here, this proposal was removed from its Title VI moorings, passed by the House, and further modified, and then passed, by the Senate in a form that was adopted by the Conference Committee. See S. Conf. Rep. No. 92–798, pp. 221–222 (1972).

[17] The pertinent provisions of Titles IX and VI are quoted in nn. 3 and 5, *supra*. Although Title IX is applicable only to certain educational institutions receiving federal financial assistance, Title VI is applicable to additional institutions such as hospitals, highway departments, and housing authorities.

same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination.[18] Neither statute expressly mentions a private remedy for the person excluded from participation in a federally funded program. The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years.[19]

In 1972 when Title IX was enacted, the critical language in Title VI had already been construed as creating a private remedy. Most particularly, in 1967, a distinguished panel of the Court of Appeals for the Fifth Circuit squarely decided this issue in an opinion that was repeatedly cited with approval and never questioned during the ensuing five years.[20] In addition, at least a dozen other federal courts reached similar conclusions in the same or related contexts during those years.[21] It is always appropriate to assume that our

---

[18] See n. 4, *supra*.

[19] "The same [enforcement] procedure that was set up and has operated with great success under the 1964 Civil Rights Act, and the regulations thereunder[,] would be equally applicable to discrimination [prohibited by Title IX]." 117 Cong. Rec. 30408 (1971) (Sen. Bayh). Accord, 118 Cong. Rec. 5807 (1972) (Sen. Bayh); *id.*, at 18437 (Sen. Bayh) ("[E]nforcement of [Title IX] will draw heavily on these precedents" under the Civil Rights Act of 1964).

[20] *Bossier Parish School Board* v. *Lemon*, 370 F. 2d 847, 852 (CA5 1967), cert. denied, 388 U. S. 911. The panel included Judge Wisdom, who wrote the opinion, and then Judge (now CHIEF JUSTICE) Burger, sitting by designation, and then Judge (now Chief Judge) Brown. *Bossier* was relied on in, *e. g.*, *Southern Christian Leadership Conference, Inc.* v. *Connolly*, 331 F. Supp. 940 (ED Mich. 1971); *Gautreaux* v. *Chicago Housing Authority*, 265 F. Supp. 582 (ND Ill. 1967).

[21] In addition to the Fifth Circuit in *Bossier*, at least four other federal courts explicitly relied on Title VI as the basis for a cause of action on the part of a private victim of discrimination against the alleged discriminator. See *Blackshear Residents Org.* v. *Housing Authority of Austin*, 347 F. Supp. 1138, 1146 (WD Tex. 1972); *Hawthorne* v. *Kenbridge Recreation Assn.*, 341 F. Supp. 1382, 1383–1384 (ED Va. 1972); *Gautreaux* v. *Chicago*

elected representatives, like other citizens, know the law; in this case, because of their repeated references to Title VI and its modes of enforcement, we are especially justified in presuming both that those representatives were aware of the

---

*Housing Authority, supra; Lemon* v. *Bossier Parish School Board,* 240 F. Supp. 709, 713 (WD La. 1965), aff'd, 370 F. 2d 847 (CA5 1967).

Although 42 U. S. C. § 1983 might have provided an alternative and express cause of action in some of these cases—had it been relied upon—see generally *Chapman* v. *Houston Welfare Rights Org., ante,* p. 600, that section was certainly not available in *Kenbridge, supra,* involving a private defendant. Moreover, § 1983 was clearly unavailable (and no other express cause of action such as is provided in the Administrative Procedure Act was relied upon) in four other pre-1972 cases that either expressly or impliedly found causes of action under Title VI in a somewhat different context than is involved in this case. Thus, private plaintiffs successfully sued officials of the Federal Government under Title VI, and secured orders requiring those officials either to aid recipients of federal funds in devising nondiscriminatory alternatives to presently discriminatory programs, or to cut off funds to those recipients. See *Gautreaux* v. *Romney,* 448 F. 2d 731, 737–740 (CA7 1971), later appeal, *Gautreaux* v. *Chicago Housing Authority,* 503 F. 2d 930 (CA7 1974), aff'd *sub nom. Hills* v. *Gautreaux,* 425 U. S. 284; *Shannon* v. *HUD,* 436 F. 2d 809, 820 (CA3 1970) (explicit discussion of cause of action); *Southern Christian Leadership Conference, Inc.* v. *Connolly, supra,* at 943–945 (explicit discussion of cause of action); *Hicks* v. *Weaver,* 302 F. Supp. 619, 622–623 (ED La. 1969).

Finally, several other pre-1972 decisions relied on Title VI as a basis for relief in favor of private litigants, although with language suggesting that § 1983 may have provided the cause of action. See *Alvarado* v. *El Paso Independent School Dist.,* 445 F. 2d 1011 (CA5 1971); *Nashville I–40 Steering Committee* v. *Ellington,* 387 F. 2d 179, 181 (CA6 1967), cert. denied, 390 U. S. 921; *Anderson* v. *San Francisco Unified School Dist.,* 357 F. Supp. 248 (ND Cal. 1972); *McGhee* v. *Nashville Special School Dist. No. 1,* 11 Race Rel. L. Rep. 698 (WD Ark. 1966).

See also *Gautreaux* v. *Chicago Housing Authority,* 436 F. 2d 306 (CA7 1970) (dicta), cert. denied, 402 U. S. 922; *Gautreaux* v. *Chicago Housing Authority,* 296 F. Supp. 907 (ND Ill. 1969) (dicta); *Rolfe* v. *County Board of Education,* 282 F. Supp. 192 (ED Tenn. 1966) (dicta), aff'd, 391 F. 2d 77 (CA6 1968).

prior interpretation of Title VI and that that interpretation reflects their intent with respect to Title IX.

Moreover, in 1969, in *Allen* v. *State Board of Elections,* 393 U. S. 544, this Court had interpreted the comparable language in § 5 of the Voting Rights Act as sufficient to authorize a private remedy.[22] Indeed, during the period between the enactment of Title VI in 1964 and the enactment of Title IX in 1972, this Court had consistently found implied remedies— often in cases much less clear than this.[23] It was *after* 1972 that this Court decided *Cort* v. *Ash* and the other cases cited by the Court of Appeals in support of its strict construction of the remedial aspect of the statute.[24] We, of course, adhere to the strict approach followed in our recent cases, but our evaluation of congressional action in 1972 must take into

---

[22] In fact, Congress enacted Title IX against a backdrop of three recently issued implied-cause-of-action decisions of this Court involving civil rights statutes with language similar to that in Title IX. In all three, a cause of action was found. See *Sullivan* v. *Little Hunting Park,* 396 U. S. 229; *Allen; Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409. See generally n. 13, *supra.*

[23] In the decade preceding the enactment of Title IX, the Court decided six implied-cause-of-action cases. In all of them a cause of action was found. *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6; *Sullivan* v. *Little Hunting Park, supra; Allen; Jones* v. *Alfred H. Mayer Co., supra; Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191; *J. I. Case Co.* v. *Borak,* 377 U. S. 426. See generally n. 13, *supra.*

[24] The Court of Appeals relied on *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453; *Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412; and *Cort* v. *Ash.* In subsequent cases, the Court has continued to give careful attention to claims that a private remedy should be implied in statutes which omit any express remedy. See *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49; *Piper* v. *Chris-Craft Industries,* 430 U. S. 1. The Court's decidedly different approach since 1972 to cause of action by implication has not gone without scholarly notice. *E. g.,* Pitt, Standing to Sue Under the Williams Act After *Chris-Craft:* A Leaky Ship on Troubled Waters, 34 Bus. Law. 117, 120, 162 (1978).

account its contemporary legal context. In sum, it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with these unusually important precedents from this and other federal courts and that it expected its enactment to be interpreted in conformity with them.

It is not, however, necessary to rely on these presumptions. The package of statutes of which Title IX is one part also contains a provision whose language and history demonstrate that Congress itself understood Title VI, and thus its companion, Title IX, as creating a private remedy. Section 718 of the Education Amendments authorizes federal courts to award attorney's fees to the prevailing parties, other than the United States, in private actions brought against public educational agencies to enforce Title VI in the context of elementary and secondary education.[25] The language of this provision explicitly presumes the availability of private suits to enforce Title VI in the education context.[26] For many such

---

[25] Section 718, 86 Stat. 369, is codified in 20 U. S. C. § 1617:

"Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this title or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

This section was a portion of Title VII of the Education Amendments of 1972, also known as the Emergency School Aid Act. Under this Act federal funds are made available to elementary and secondary schools that are going through the process of court-ordered or voluntary desegregation. See § 702 of the Act, 20 U. S. C. § 1601.

[26] See S. Conf. Rep. No. 92–798, p. 218 (1972): "*Attorney fees.*—The Senate amendment, but not the House amendment, authorized the payment of attorneys fees to successful plaintiffs in suits brought for violation of . . . Title VI of the Civil Rights Act . . . . The conference substitute contains this provision." See also n. 6, *supra.*

suits, no express cause of action was then available; hence Congress must have assumed that one could be implied under Title VI itself.[27] That assumption was made explicit during the debates on § 718.[28] It was also aired during the debates

[27] Although there is nothing in the statute or legislative history that says as much, it may be that Congress expected 42 U. S. C. § 1983 to provide an explicit cause of action for some of the suits contemplated by § 718. But § 1983 is assuredly not available for suits against the United States, nor at the time § 718 was passed was it available for suits against "a State (or any agency thereof)," nor even perhaps for suits against a "local educational agency." See *Mt. Healthy City Board of Education* v. *Doyle,* 429 U. S. 274, 277–278; *Monroe* v. *Pape,* 365 U. S. 167. Cf. *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658. Section 718 has been interpreted liberally by the federal courts. *E. g., Norwood* v. *Harrison,* 410 F. Supp. 133 (ND Miss. 1976), appeal dism'd, 563 F. 2d 722 (CA5 1977).

[28] "Mr. President, it is said that [§ 718] will encourage litigation in the South . . . .

"I can only say that what [§ 718] does, in essence, is that it says a party is entitled to pursue his remedy if there is a violation [of Title VII of the Education Amendments of 1972], if there is a violation of the 1964 Civil Rights Act, if there is a violation of the 14th amendment to the Constitution of the United States. It says that, in the discretion of the court, if a mandate comes down, if a judgment is rendered, and if it was necessary to bring the action to see to it that the act was enforced, [the court] could allow the cost and a reasonable fee for time expended. That is the extent of it." 117 Cong. Rec. 11725–11726 (1971) (Sen. Cook).

In light of the language of § 718, see n. 25, *supra,* it is, of course, clear that Senator Cook's reference to "the 1964 Civil Rights Act" means Title VI of the Act. Accord, 117 Cong. Rec. 11338 (1971) (Sen. Dominick); *id.,* at 11340 (Sen. Mondale); *id.,* at 11524 (Sen. Allen); *id.,* at 11527–11528 (Sen. Cook).

These same debates provide another important indication that Congress presumed that, wherever necessary, private causes of action must exist in order to justify the suits contemplated by § 718. Section 718 provides attorney's fees in suits seeking compliance with three separate provisions— the Constitution, Title VI, and § 718's sister provisions in Title VII of the Education Amendments of 1972. None of the last-mentioned sister provisions contains an express cause of action. Section 718 also contemplates three types of defendants in those suits—local educational agencies, States and state agencies, and the Federal Government. In exploring the mean-

on other provisions in the Education Amendments of 1972 [29] and on Title IX itself,[30] and is consistent with the Executive Branch's apparent understanding of Title VI at the time.[31]

---

ing of the provision, the question arose as to what might occur if a private litigant attempted to sue the Federal Government to force compliance with Title VII of the Education Amendments of 1972. The following colloquy took place:

"Mr. COOK. [I]f the Federal Government is defendant, and if the Federal Government is found guilty of violation of this act [Title VII of the Education Amendments of 1972], and it is in fact discriminating, then it is conceivable that the attorney's fees and the costs could go against the Federal Government.

"Mr. PELL. But can an individual sue the Federal Government?

"Mr. COOK. Under this title?

"Mr. PELL. Yes.

"Mr. COOK. Oh yes."

[29] The question of busing to achieve racial balance caused considerable debate during consideration of the Education Amendments of 1972. During those debates, it was proposed that the jurisdiction of the federal courts be limited to prevent them from ordering such busing. In defending federal jurisdiction in this area, the opponents of the proposal described the courts as an important, even the most important, reliance in the enforcement of Title VI. For example, Senator Javits stated: "We cannot simply strike down these [judicial] enforcement powers without effectively striking down title VI of the Civil Rights Act of 1964." 118 Cong. Rec. 5483 (1972). See also id., at 7558–7559; id., at 7561 (Rep. Stokes) ("The busing furor is a symptom, like pain, of the effort which has been made to carry out the mandate of Brown against Board of Education and Title VI of the Civil Rights Act. Busing has been used successfully in many communities. The courts have required it because it works").

[30] Senator Bayh, for example, explained that the time limits provided in Title IX for undergraduate institutions that chose to become coeducational after previously being single sex, § 901 (a)(2)(A), 20 U. S. C. § 1681 (a)(2)(A), are "consistent with the type of timetable that has been set in the past by *court decisions* under Title VI of the 1964 Civil Rights Act in other areas of discrimination." 117 Cong. Rec. 30409 (1971) (emphasis added). See also id., at 30404 (Sen. Bayh); id., at 30407 (Sen. Javits).

[31] In 1965, the Justice Department intervened on behalf of the private litigants in the *Bossier* litigation, which resulted in the first two judicial

Finally, the very persistence—before 1972 and since, among judges and executive officials, as well as among litigants and their counsel,[32] and even implicit in decisions of this Court[33]—

opinions implying a cause of action under Title VI. See nn. 20 and 21, *supra*. As far as those opinions indicate, the Government fully supported the private plaintiffs' position. See *Bossier Parish School Board* v. *Lemon*, 370 F. 2d 847 (CA5 1967); *Lemon* v. *Bossier Parish School Board*, 240 F. Supp. 709 (WD La. 1965).

[32] See nn. 8, 21, *supra*; n. 39, *infra*.

[33] Since 1972, the Court has twice reached the merits in suits brought by private litigants to enforce Title VI. In both cases it determined that Title VI justified at least some of the relief sought by the private litigants. *Lau* v. *Nichols*, 414 U. S. 563, 566–569; *Hills* v. *Gautreaux*, 425 U. S., at 286. Although in neither case did the Court in terms address the question of whether Title VI provides a cause of action, in both the issue had been explicitly raised by the parties at one level of the litigation or another. These cases are accordingly consistent, at least, with the widely accepted assumption that Title VI creates a private cause of action.

In *Lau*, the respondents (the defendants below) argued "that the Fourteenth Amendment and the Civil Rights Act do not give a party a federal cause of action every time a School District fails to resolve a problem—not of its making—presented to it by a student." Brief in Opposition, O. T. 1973, No. 72–6520, p. 7. On the other hand, the Federal Government and at least one other *amicus curiae* explicitly took the opposite position—that Title VI was itself sufficient to create a cause of action. Memorandum for United States as *Amicus Curiae*, O. T. 1973, No. 72–6520, p. 13, and n. 5, citing *Bossier Parish School Board* v. *Lemon, supra;* Brief for Puerto Rican Legal Defense & Education Fund, Inc., as *Amicus Curiae*, O. T. 1973, No. 72–6520, p. 2. But cf. Brief for National Education Assn. et al. as *Amici Curiae*, O. T. 1973, No. 72–6520, p. 5 (42 U. S. C. § 1983 provided the cause of action for the relevant breach of Title VI).

In the lengthy litigation culminating in the Court's decision in *Hills* v. *Gautreaux, supra,* a private litigant who claimed that public housing in Chicago was being located in a racially discriminatory fashion, had filed two separate complaints relying in part on Title VI—one against the Chicago Housing Authority (CHA) and one against the Department of Housing and Urban Development (HUD), which was the agency providing federal funds to CHA. Although the two cases proceeded separately for years, they were consolidated before they reached this Court. In the early stages of the CHA suit, the District Court, over CHA's objection, explicitly

of the assumption that both Title VI and Title IX created a private right of action for the victims of illegal discrimination and the absence of legislative action to change that assumption provide further evidence that Congress at least acquiesces in, and apparently affirms, that assumption. See n. 7, *supra*. We have no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination.[34]

*Third,* under *Cort,* a private remedy should not be implied if it would frustrate the underlying purpose of the legislative scheme. On the other hand, when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute.[35]

---

determined that there is a cause of action under Title VI even where § 1983 is not relied upon. *Gautreaux* v. *Chicago Housing Authority,* 265 F. Supp. 582 (ND Ill. 1967). In an unreported opinion, that court apparently also found that the Title VI complaint against HUD stated a cause of action. See *Gautreaux* v. *Romney,* 448 F. 2d, at 737–740 (on appeal from the unreported decision; cause-of-action issue not raised). The complaint in that suit, which is reprinted in the appendix filed by the parties in *Hills* v. *Gautreaux,* derives the cause of action directly from Title VI. App., O. T. 1975, No. 74–1047, p. 35. Section 1983 was not available in this suit against federal officials, and the Administrative Procedure Act was nowhere mentioned. Although by the time the consolidated cases reached this Court the primary contested issue was the propriety of the relief ordered by the District Court against HUD, the Court did note that the agency had "been judicially found to have violated the Fifth Amendment and the Civil Rights Act of 1964 . . . ." 425 U. S., at 286. The Government did not raise the cause-of-action question.

[34] "In sum, we conclude that Congress clearly understood that it was conferring power upon the courts to [grant relief] . . . under the statute." See *Dalia* v. *United States, ante,* at 254. Indeed, the evidence of legislative intent is so compelling that we have no hesitation in concluding that even the test now espoused by Mr. Justice Powell, *post,* at 749, is satisfied in this case.

[35] See *Allen* v. *State Board of Elections,* 393 U. S., at 556; *Wyandotte*

Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes.[36]

The first purpose is generally served by the statutory procedure for the termination of federal financial support for institutions engaged in discriminatory practices.[37]  That rem-

---

*Transportation Co.* v. *United States,* 389 U. S., at 202; *J. I. Case Co.* v. *Borak,* 377 U. S., at 432; *Machinists* v. *Central Airlines,* 372 U. S., at 690.

[36] With respect to Title VI, for example, the comments of Senator Pastore:

"[T]he purpose of title VI is to make sure that funds of the United States are not used to support racial discrimination," 110 Cong. Rec. 7062 (1964),

should be compared with the comments of Representative Lindsay:

"Everything in this proposed legislation has to do with providing a body of law which will surround and protect the individual from some power complex.  This bill is designed for the protection of individuals.  When an individual is wronged he can invoke the protection to himself, but if he is unable to do so because of economic distress or because of fear then the Federal Government is authorized to invoke that individual protection for that individual . . . ." *Id.,* at 1540.

With respect to Title IX, the comments of Representative Mink:

"Any college or university which has [a] . . . policy which discriminates against women applicants . . . is free to do so under [Title IX] but such institutions should not be asking the taxpayers of this country to pay for this kind of discrimination.  Millions of women pay taxes into the Federal treasury and we collectively resent that these funds should be used for the support of institutions to which we are denied equal access," 117 Cong. Rec. 39252 (1971),

should be compared with the comments of Senator Bayh:

"[Title IX] is a strong and comprehensive measure which I believe is needed if we are to provide women with solid legal protection as they seek education and training for later careers . . . ." 118 Cong. Rec. 5806–5807 (1972).

[37] See § 902 of Title IX, 20 U. S. C. § 1682.  There are some occasions, however, when even this purpose cannot be served unless a private remedy

edy is, however, severe and often may not provide an appropriate means of accomplishing the second purpose if merely an isolated violation has occurred.[38] In that situation, the violation might be remedied more efficiently by an order requiring an institution to accept an applicant who had been improperly excluded.[39] Moreover, in that kind of situation it makes little sense to impose on an individual, whose only interest is in obtaining a benefit for herself, or on HEW, the burden of demonstrating that an institution's practices are so pervasively discriminatory that a complete cutoff of federal funding is appropriate. The award of individual relief to a private litigant who has prosecuted her own suit is not only

---

is available. For a recipient of a one-shot grant of federal money, for example, the temptation to use the fruits of that money in furtherance of a discriminatory policy adopted several years later would not be dampened by any powers given the federal donor agency under Title IX.

[38] Congress itself has noted the severity of the fund-cutoff remedy and has described it as a last resort, all else—including "lawsuits"—failing. See, e. g., 110 Cong. Rec. 7067 (1964) (Sen. Ribicoff):

"Personally, I think it would be a rare case when funds would actually be cut off. In most cases alternative remedies, principally lawsuits to end discrimination, would be the preferable and more effective remedy. If a Negro child were kept out of a school receiving Federal funds, I think it would be better to get the Negro child into school than to cut off funds and impair the education of the white children."

See also id., at 5090, 6544 (Sen. Humphrey); id., at 7103 (Sen. Javits).

[39] This insight is not of recent vintage. In *Cumming* v. *Richmond County Board of Education*, 175 U. S. 528, several black taxpayers sued a school board that provided free high school education to white children, but not to black children. The remedy they sought under the separate-but-equal doctrine then in force under the Fourteenth Amendment, see *Plessy* v. *Ferguson*, 163 U. S. 537, was closure of the white high school rather than appropriation of funds for a black high school. Mr. Justice Harlan for the Court rejected this claim, noting that "the result would only be to take from white children . . . without giving to colored children . . . ." 175 U. S., at 544. He suggested that the result might be different if "the plaintiffs had sought to compel the Board of Education . . . to establish and maintain a high school for colored children . . . ." *Id.*, at 545.

sensible but is also fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute.[40]

The Department of Health, Education, and Welfare, which is charged with the responsibility for administering Title IX, perceives no inconsistency between the private remedy and the public remedy.[41] On the contrary, the agency takes the

---

[40] In the context of noting the kinship of Title VI and Title IX, Senator Bayh lauded the enforcement procedures available under the former for their "great success" and "their effectiveness and flexibility." 117 Cong. Rec. 30408 (1971); 118 Cong. Rec. 5807 (1972). As noted earlier, private suits had become an important and especially flexible part of those procedures by 1972, and were almost assuredly known to Congress. See also 117 Cong. Rec. 11339 (1971) (Sen. Mondale) (noting that attorney's fees for successful Title VI litigants under § 718 were necessary to forestall a "law enforcement crisis in the field of civil rights").

A further indication of the consistency of Title IX's purposes and the existence of a private remedy is the fact that, until the District Court and Court of Appeals decisions in this case, the federal courts had consistently recognized such a remedy under that Title and under Title VI before it. *E. g., Uzzell* v. *Friday*, 547 F. 2d 801, aff'd en banc, 558 F. 2d 727 (CA4 1977), vacated on other grounds, 438 U. S. 912; *Gilliam* v. *Omaha*, 524 F. 2d 1013 (CA8 1975); *Garrett* v. *Hamtramck*, 503 F. 2d 1236 (CA6 1974); *Serna* v. *Portales Municipal Schools*, 499 F. 2d 1147 (CA10 1974); *Otero* v. *New York City Housing Authority*, 484 F. 2d 1122, 1138 (CA2 1973); *Piascik* v. *Cleveland Museum of Art*, 426 F. Supp. 779 (ND Ohio 1976); cases cited in n. 21, *supra*. This Court has frequently accepted a history of federal-court recognition of a cause of action as indicative of the propriety of its implication. *E. g., Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S., at 730; *Machinists* v. *Central Airlines, supra*, at 690; *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S., at 39.

[41] It has been suggested that, at least in the absence of an exhaustion requirement, private litigation will interfere with HEW's enforcement procedures under § 902 of Title IX. The simple answer to this suggestion is that the Government itself perceives no such interference under the circumstances of this case, and argues that if the possibility of interference arises in another case, appropriate action can be taken by the relevant court at that time. See n. 8, *supra*.

In addition, Congress itself was apparently not worried about such interference when it passed Title IX. As discussed *supra*, at 699–700, the statute of which Title IX is a part also contains a provision, § 718, allow-

unequivocal position that the individual remedy will provide effective assistance to achieving the statutory purposes. See

ing attorney's fees under Title VI. No matter how narrowly that provision is read, it certainly envisions private enforcement suits apart from the administrative procedures that Title VI, like Title IX, expressly creates. If such suits would not hamper administrative enforcement of Title VI against local and state school officials, it is hard to see how they would do so with respect to other recipients of federal funds.

True, this Court has sometimes refused to imply private rights of action where administrative or like remedies are expressly available. *E. g., National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453; *T. I. M. E. Inc.* v. *United States,* 359 U. S. 464. But see *Cort* v. *Ash,* 422 U. S., at 79; *Superintendent of Insurance* v. *Banker's Life & Cas. Co.,* 404 U. S. 6; *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191; *J. I. Case Co.* v. *Borak,* 377 U. S. 426. But it has never withheld a private remedy where the statute explicitly confers a benefit on a class of persons and where it does not assure those persons the ability to activate and participate in the administrative process contemplated by the statute. See *Rosado* v. *Wyman,* 397 U. S. 397, 406 n. 8; cf. *Cort* v. *Ash, supra,* at 74–75; *Calhoon* v. *Harvey,* 379 U. S. 134. As the Government itself points out in this case, Title IX not only does not provide such a mechanism, but the complaint procedure adopted by HEW does not allow the complainant to participate in the investigation or subsequent enforcement proceedings. Moreover, even if those proceedings result in a finding of a violation, a resulting voluntary compliance agreement need not include relief for the complainant. Brief for Federal Respondents 59 n. 36. Furthermore, the agency may simply decide not to investigate— a decision that often will be based on a lack of enforcement resources, rather than on any conclusion on the merits of the complaint. See n. 42, *infra.* In that case, if no private remedy exists, the complainant is relegated to a suit under the Administrative Procedure Act to compel the agency to investigate and cut off funds. *E. g., Adams* v. *Richardson,* 156 U. S. App. D. C. 267, 480 F. 2d 1159 (1973). But surely this alternative is far more disruptive of HEW's efforts efficiently to allocate its enforcement resources under Title IX than a private suit against the recipient of federal aid could ever be.

For these same reasons, we are not persuaded that individual suits are inappropriate in advance of exhaustion of administrative remedies. Because the individual complainants cannot assure themselves that the

n. 8, *supra.* The agency's position is unquestionably correct.[42]

*Fourth,* the final inquiry suggested by *Cort* is whether implying a federal remedy is inappropriate because the subject matter involves an area basically of concern to the States. No such problem is raised by a prohibition against invidious discrimination of any sort, including that on the basis of sex. Since the Civil War, the Federal Government and the federal courts have been the " *'primary* and powerful reliances' " in protecting citizens against such discrimination. *Steffel* v. *Thompson,* 415 U. S. 452, 464 (emphasis in original), quoting F. Frankfurter & J. Landis, The Business of the Supreme Court 65 (1928). Moreover, it is the expenditure of federal funds

---

administrative process will reach a decision on their complaints within a reasonable time, it makes little sense to require exhaustion. See 3 K. Davis, Administrative Law Treatise § 20.01, p. 57 (1958).

[42] In its submissions to this Court, as well as in other public statements, HEW has candidly admitted that it does not have the resources necessary to enforce Title IX in a substantial number of circumstances:

"As a practical matter, HEW cannot hope to police all federally funded education programs, and even if administrative enforcement were always feasible, it often might not redress individual injuries. An implied private right of action is necessary to ensure that the fundamental purpose of Title IX, the elimination of sex discrimination in federally funded education programs, is achieved." Reply Brief for Federal Respondents 6. See also 40 Fed. Reg. 24148–24159 (1975).

In the notice of proposed rulemaking just cited, in fact, HEW proposed to employ its enforcement resources under both Title VI and Title IX *solely* to remedy "systemic discrimination rather than [to use] a reactive or complaint-oriented approach geared toward securing individual relief for persons claiming discrimination." *Id.,* at 24148. The agency explained this approach as necessary to allow it to manage its workload—a workload primarily made up of "complaints involving sex discrimination in higher education academic employment." *Ibid.* Adverse commentary on this proposal led HEW to abandon it, although the result has been a steadily increasing backlog of unprocessed complaints. Nonetheless, its explanation of the proposal supports the conclusion that HEW's enforcement capabilities under Title IX are especially limited in precisely those areas where private suits can be most effective.

that provides the justification for this particular statutory prohibition. There can be no question but that this aspect of the *Cort* analysis supports the implication of a private federal remedy.

In sum, there is no need in this case to weigh the four *Cort* factors; all of them support the same result. Not only the words and history of Title IX, but also its subject matter and underlying purposes, counsel implication of a cause of action in favor of private victims of discrimination.

## II

Respondents' principal argument against implying a cause of action under Title IX is that it is unwise to subject admissions decisions of universities to judicial scrutiny at the behest of disappointed applicants on a case-by-case basis. They argue that this kind of litigation is burdensome and inevitably will have an adverse effect on the independence of members of university committees.

This argument is not original to this litigation. It was forcefully advanced in both 1964 and 1972 by the congressional opponents of Title VI and Title IX,[43] and squarely rejected by the congressional majorities that passed the two statutes. In short, respondents' principal contention is not a legal argument at all; it addresses a policy issue that Congress has already resolved.

History has borne out the judgment of Congress. Although victims of discrimination on the basis of race, religion, or national origin have had private Title VI remedies available at least since 1965, see n. 21, *supra,* respondents have not come forward with any demonstration that Title VI litigation has been so costly or voluminous that either the academic community or the courts have been unduly burdened. Nothing but speculation supports the argument that university

---

[43] *E. g.,* 117 Cong. Rec. 39254 (1971) (Rep. Wyman); 110 Cong. Rec. 5253 (1964) (Sen. Talmadge).

administrators will be so concerned about the risk of litigation that they will fail to discharge their important responsibilities in an independent and professional manner.[44]

## III

Respondents advance two other arguments that deserve brief mention. Starting from the premise that Title IX and Title VI should receive the same construction, respondents argue (1) that a comparison of Title VI with other Titles of the Civil Rights Act of 1964 demonstrates that Congress created express private remedies whenever it found them desirable;[45] and (2) that certain excerpts from the legislative history of Title VI foreclose the implication of a private remedy.[46]

Even if these arguments were persuasive with respect to Congress' understanding in 1964 when it passed Title VI, they would not overcome the fact that in 1972 when it passed Title IX, Congress was under the impression that Title VI

---

[44] Furthermore, unless respondents are arguing that Title IX (and, by implication, Title VI) is itself unconstitutional, this argument is entirely misconceived. Whatever disruption of the academic community may accompany an occasional individual suit seeking admission is dwarfed by the relief expressly contemplated by the statute—a cutoff of all federal funds. For this reason, in fact, the opponents of Title VI argued that the provision should be rejected in favor of reliance on judicial remedies available under the Fourteenth Amendment. For example, in reply to Senator Humphrey's advocacy of the administrative remedy, Senator Talmadge asked:

"Why does not the Senator rely on the court's authority [under the Fourteenth Amendment], instead of giving arbitrary, capricious, wholesale punitive power to some Federal bureaucrat to starve entire cities, towns, States, and regions at one fell swoop?" 110 Cong. Rec. 5254 (1964).

[45] See 42 U. S. C. § 2000a–3 (Title II); 42 U. S. C. §§ 2000e–5 (f)(1), (3) (Title VII).

[46] See 110 Cong. Rec. 1519 (1964) (Rep. Celler); id., at 2467 (Rep. Gill); id., at 6562 (Sen. Kuchel); id., at 7063 (Sen. Pastore); id., at 7065 (Sen. Keating); id., at 8345 (Sen. Proxmire).

could be enforced by a private action and that Title IX would be similarly enforceable. See *supra,* at 696–699. "For the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Brown* v. *GSA,* 425 U. S. 820, 828. But each of respondents' arguments is, in any event, unpersuasive.

The fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section. See, *e. g., J. I. Case Co.* v. *Borak,* 377 U. S. 426; *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191. Rather, the Court has generally avoided this type of "excursion into extrapolation of legislative intent," *Cort* v. *Ash,* 422 U. S., at 83 n. 14, unless there is other, more convincing, evidence that Congress meant to exclude the remedy. See *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S., at 458–461.

With one set of exceptions, the excerpts from the legislative history cited by respondents as contrary to implication of a private remedy under Title VI, were all concerned with a procedure for terminating federal funding.[47] None of them evidences any hostility toward an implied private remedy to terminate the offending discrimination. They are consistent with the assumption expressed frequently during the debates that such a judicial remedy—either through the kind of broad construction of state action under § 1983 adopted by the Court of Appeals for the Fourth Circuit in *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F. 2d 959 (1963),[48]

---

[47] As discussed earlier, that type of procedure is far more severe than individual suits, and was already the subject of express administrative provisions in Title VI.

[48] Consider the following comment by Senator Humphrey:

"The purpose of Title VI is to make sure that funds of the United States are not used to support racial discrimination. In many instances the practices of segregation or discrimination, which Title VI seeks to end, are

or through an implied remedy [49]—would be available to private litigants regardless of how the fund-cutoff issue was resolved.

unconstitutional. This is clearly so wherever Federal funds go to a State agency which engages in racial discrimination. It may also be so where Federal funds go to support private, segregated institutions, under the decision in *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F. 2d 959 (CA4 1963), [cert. denied, 376 U. S. 938]. In all cases, such discrimination is contrary to national policy, and to the moral sense of the Nation. Thus, title VI is simply designed to insure that Federal funds are spent in accordance with the Constitution and the moral sense of the Nation." 110 Cong. Rec. 6544 (1964). See also *ibid.* (Sen. Humphrey); *id.,* at 7062 (Sen. Pastore); *id.,* at 7065 (Sen. Ribicoff); *id.,* at 12677 (Sen. Allott); *id.,* at 12719 (Sen. Javits).

Although it has been suggested that the state-action doctrine in *Simkins* is overbroad, *e. g., Greco* v. *Orange Memorial Hospital Corp.,* 513 F. 2d 873 (CA5 1975), there is no denying that the Title VI Congress assumed and approved the availability of private suits against many private recipients of federal funds.

[49] Various statements made during the debates suggest an assumption that Title VI would be judicially enforceable apart from the administrative procedures contained in § 602. In addition to Senator Ribicoff's reference to "lawsuits" as the principal and preferable "alternative" to cutting off funds under the administrative remedy, n. 38, *supra,* see, for example, Senator Humphrey's statement:

"*Title VI* would have a substantial and eminently desirable impact on programs of assistance to education. Title VI would require elimination of racial discrimination and segregation in all 'impacted area' schools receiving Federal grants under Public Laws 815 and 874. Racial segregation at such schools is now prohibited by the Constitution. The Commissioner of Education would be warranted in relying on any existing plans of desegregation which appeared adequate and effective, and on *litigation by private parties* or by the Attorney General under title IV [of the 1964 Civil Rights Act], *as the primary means of securing compliance with this nondiscriminatory requirement.* It is not expected that funds would be cut off so long as reasonable steps were being taken in good faith to end unconstitutional segregation." 110 Cong. Rec. 6545 (1964) (emphasis added).

Also interesting is a debate on the Senate floor on March 13, 1964. *Id.,* at 5253–5256. Senator Talmadge began the relevant discussion by characterizing the "broad" powers delegated federal agencies under

The only excerpt relied upon by respondents that deals precisely with the question whether the victim of discrimination has a private remedy under Title VI was a comment by

§ 602 as "barbarous." *Id.*, at 5253. When Senator Humphrey responded that the "right" against discrimination embodied in § 601 justified those broad enforcement powers, the following exchange ensued:

"Mr. TALMADGE. That right is enforceable in every court of the land, and the Senator from Minnesota knows it.

"Mr. HUMPHREY. That is correct. The existing law of the land is stated in section 601. Sections 602 and 603 . . . do not represent an extension of *that* law. . . . They represent a procedural limitation on the power of an affected *agency* to enforce existing powers." *Id.*, at 5254 (emphasis added).

At this point, the debate began to focus on an argument repeatedly made by the opponents of Title VI until it was subsequently amended. See also *id.*, at 13435–13436 (Sen. Long). Although recipients of federal aid in the form of "a contract of insurance or guaranty" were exempted from the administrative enforcement procedure in § 602, the opponents felt that the exemption should be included in the statement of rights in § 601 as well. Otherwise, they argued, the exemption would not be effective—apparently because of the possibility, mentioned by Senator Talmadge and quoted above, of judicial enforcement outside of § 602. In the midst of discussing this point, Senator Stennis asked if "section 602 is *a* method by which section 601 will be enforced," to which Senator Humphrey replied: "Yes, it is the method for those governmental *agencies* and activities covered by Title VI." 110 Cong. Rec. 5255 (1964) (emphasis added).

At this point, Senator Case entered the fray:

". . . I wish to make clear that the words and provisions of section 601 and the substantive rights established and stated in that section are not limited by the limiting words of section 602. Section 602 says that when a department or agency of the Government—and I think the Senator was correct, earlier, when he made this careful distinction—in dealing with the kinds of programs which are referred to in section 602, attempts to prevent the discrimination, or what-not, the department must follow this procedure. I agree. My only point is that I do not want my embracement of this bill to be construed as indicating that I believe that the substantive rights of an individual, as they may exist under the Constitution, or as they may be stated in section 601, are limited in any degree whatsoever." *Ibid.*

In his effort to mollify the opponents of Title VI on the issue of federal guarantees, Senator Humphrey at first appeared to disagree with Senator

Senator Keating. In it, he expressed disappointment at the administration's failure to include his suggestion for an express remedy in its final proposed bill.[50] Our analysis of the

Case's interpretation. However, when the latter reiterated the point that § 602 "is not intended to limit the rights of individuals, if they have any way of enforcing their rights apart from the provisions of the bill, by way of suit or any other procedure," Senator Humphrey agreed—and apparently went further:

"I thoroughly agree with the Senator insofar as an *individual* is concerned. As a *citizen* of the United States, he has his full constitutional rights. He has his right to go to court and institute suit and whatever may be provided in the *law and* in the Constitution. There would be no limitation on the *individual*. The limitation would be on the qualification of Federal *agencies*." *Id.*, at 5256 (emphasis added).

Senator Keating's conclusion of this debate is discussed in n. 52, *infra.*

Two points need be made about this exchange. First, the controversy over how to treat federal guarantees was later resolved by removing the reference to those guarantees from § 602 and adding a new provision, § 605, which simply exempted them from the effect of the title. This solved the complaints of the Title's opponents, without diluting the declaration of rights in § 601. Second, although this debate may evidence some confusion over the law existing prior to the enactment of Title VI insofar as that law would not reach many of the *private* discriminators affected by § 601, but cf. n. 48, *supra,* it demonstrates a congressional assumption that whatever rights existed under the law were automatically enforceable by private litigants. The administrative provisions in §§ 602 and 603 were simply means by which additional—and far more controversial—procedures were established and then limited.

[50] "Parenthetically, while we favored the inclusion of the right to sue on the part of the agency, the State, or the facility which was deprived of Federal funds, we also favored the inclusion of a provision granting the right to sue to the person suffering from discrimination. This was not included in the bill." 110 Cong. Rec. 7065 (1964).

Although not cited by respondents, two other passages in the legislative history are of similar effect. See *id.*, at 5266 (Sen. Keating); Hearings before the Senate Committee on the Judiciary on S. 1731 and S. 1750, 88th Cong., 1st Sess., 335 (1963) (Sen. Keating).

In August 1963, the Justice Department agreed to redraft its original proposal for Title VI in light of congressional criticism. At that time, Senator Keating, along with Senator Ribicoff, submitted the following

legislative history convinces us, however, that neither the administration's decision not to incorporate that suggestion expressly in its bill, nor Senator Keating's response to that decision, is indicative of a rejection of a private right of action against recipients of federal funds. Instead, the former appears to have been a compromise aimed at protecting individual rights without subjecting the Government to suits,[51]

suggested provision to the Department for its consideration in the redrafting process.

"(a) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by the nondiscrimination requirement of section 601 of the Civil Rights Act of 1963, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted (1) *by the person aggrieved, or* (2) by the Attorney General for or in the name of the United States. In any proceeding hereunder, the United States shall be liable for costs the same as a private person.

"(b) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedy that may be provided by law." 109 Cong. Rec. 15375 (1963) (emphasis added).

Senator Keating explained that this section would have allowed private suits to terminate funding *or* to require "specific performance of the nondiscrimination requirement" in Title VI. *Id.*, at 15376. See generally Hearings, *supra*, at 349–352.

[51] The Keating suggestion was made in the context of broader complaints that the original version of Title VI, which is quoted in n. 14, *supra*, was too weak and too dependent on the fund-cutoff remedy. See, *e. g.*, 109 Cong. Rec. 14833–14835 (1963) (Sens. Ribicoff and Keating). That version, it should be noted, was not explicitly declarative of any individual right against discrimination. Instead, it merely allowed federal agencies to withhold funds from discriminatory recipients.

The result of the administration's reconsideration of Title VI was a compromise. Although its redraft, which in major part was enacted as Title VI, did not include an express private cause of action either to cut off funds or to end discrimination, it did rephrase § 601 as a declaration

while the latter is merely one Senator's isolated expression of a preference for an express private remedy.[52] In short, neither is inconsistent with the implication of such a remedy. Nor is there any other indication in the legislative history that any Member of Congress voted in favor of the statute in reliance on an understanding that Title VI did not include a private remedy.

---

of an absolute individual right not to have federal funds spent in aid of discrimination.

There is a plausible reason for this compromise. In its final form, § 601 was far more conducive to implication of a private remedy against a discriminatory recipient than was the original language, but at the same time was arguably *less* conducive to implication of a private remedy against the Government (as well as the recipient) to compel the cutoff of funds. Although willing to extend private rights against discriminatory recipients, the Government may not have been anxious to encourage suits against itself.

In this context, it is also understandable that some Members of Congress, as noted earlier, evidenced dissatisfaction at the unavailability under Title VI of private suits to cut off funds. See remarks cited in n. 46, *supra.* Even the Keating remark relied on by respondents, n. 50, *supra,* can be understood in this light.

[52] As noted earlier, some of Senator Keating's colleagues came to the view that the absence of an express private remedy would not foreclose the implication of one under the right-declarative language in the administration's final proposal. See n. 49, *supra.* Even Senator Keating, after listening to this view expressed by Senator Case in the March 13, 1964, debate quoted *ibid.,* appeared to agree—although he still wished the remedy were express:

"I wish to associate myself with the very careful analysis made by the Senator from New Jersey and say that I agree with him thoroughly. *If the bill does not mean what he has indicated it means, it ought to be made to mean so.* I think the limitation of powers set forth in title VI is too extensive. Under section 603 a State, or political subdivision of a State, or an agency of either, which is denied funds because discrimination is taking place, is given the right of action in court. But there is no correlative right in the citizen. If funds are granted to discriminatory projects by public officials, the citizen who is denied the benefits of the project has no correlative right to bring a suit in court, and he should have." 110 Cong. Rec. 5256 (1964) (emphasis added).

## IV

When Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights. But the Court has long recognized that under certain limited circumstances the failure of Congress to do so is not inconsistent with an intent on its part to have such a remedy available to the persons benefited by its legislation. Title IX presents the atypical situation in which *all* of the circumstances that the Court has previously identified as supportive of an implied remedy are present. We therefore conclude that petitioner may maintain her lawsuit, despite the absence of any express authorization for it in the statute.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER concurs in the judgment.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART joins, concurring.

Having joined the Court's opinion in this case, my only purpose in writing separately is to make explicit what seems to me already implicit in that opinion. I think the approach of the Court, reflected in its analysis of the problem in this case and cases such as *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49 (1978), *Cort* v. *Ash,* 422 U. S. 66 (1975), and *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453 (1974), is quite different from the analysis in earlier cases such as *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964). The question of the existence of a private right of action is basically one of statutory construction. See *ante,* at 688. And while state courts of general jurisdiction still enforcing the common law as well as statu-

tory law may be less constrained than are federal courts enforcing laws enacted by Congress, the latter must surely look to those laws to determine whether there was an intent to create a private right of action under them.

We do not write on an entirely clean slate, however, and the Court's opinion demonstrates that Congress, at least during the period of the enactment of the several Titles of the Civil Rights Act, tended to rely to a large extent on the courts to *decide* whether there should be a private right of action, rather than determining this question for itself. Cases such as *J. I. Case Co.* v. *Borak, supra,* and numerous cases from other federal courts, gave Congress good reason to think that the federal judiciary would undertake this task.

I fully agree with the Court's statement that "[w]hen Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights." *Ante,* at 717. It seems to me that the factors to which I have here briefly adverted apprise the lawmaking branch of the Federal Government that the ball, so to speak, may well now be in its court. Not only is it "far better" for Congress to so specify when it intends private litigants to have a cause of action, but for this very reason this Court in the future should be extremely reluctant to imply a cause of action absent such specificity on the part of the Legislative Branch.

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACKMUN joins, dissenting.

In avowedly seeking to provide an additional means to effectuate the broad purpose of § 901 of the Education Amendments of 1972, 20 U. S. C. § 1681, to end sex discrimination in federally funded educational programs, the Court fails to heed the concomitant legislative purpose not to create a new private remedy to implement this objective. Because in my view the legislative history and statutory scheme show that Congress intended not to provide a new private cause of action, and

because under our previous decisions such intent is controlling,[1] I dissent.

## I

The Court recognizes that because Title IX was explicitly patterned after Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.*, it is difficult to infer a private cause of action in the former but not in the latter. I have set out once before my reasons for concluding that a new private cause of action to enforce Title VI should not be implied, *University of California Regents* v. *Bakke,* 438 U. S. 265, 379 (1978) (separate opinion of WHITE, J.), and I find nothing in the legislative materials reviewed by the Court that convinces me to the contrary. Rather, the legislative history, like the terms of Title VI itself, makes it abundantly clear that the Act was and is a mandate to federal agencies to eliminate discrimination in federally funded programs. Although there was no intention to cut back on private remedies existing under 42 U. S. C. § 1983 to challenge discrimination occurring under color of state law, there is no basis for concluding that Congress contemplated the creation of private remedies either against private parties who previously had been subject to no constitutional or statutory obligation not to discriminate, or against federal officials or agencies involved in funding allegedly discriminatory programs.

The Court argues that because funding termination, authorized by § 602, 42 U. S. C. § 2000d-1, is a drastic remedy, Congress must have contemplated private suits in order directly and less intrusively to terminate the discrimination allegedly being practiced by the recipient institutions. But the Court's conclusion does not follow from its premise because funding termination was not contemplated as the only—or even the primary—agency action to end discrimination. Rather, Con-

---

[1] *Cort* v. *Ash,* 422 U. S. 66, 78 (1975); *Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412 (1975); *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453 (1974).

gress considered termination of financial assistance to be a remedy of last resort, and expressly obligated federal agencies to take measures to terminate discrimination without resorting to termination of funding.

Title VI was enacted on the proposition that it was contrary at least to the "moral sense of the Nation" [2] to expend federal funds in a racially discriminatory manner. This proposition was not new, for every President since President Franklin Roosevelt had, by Executive Order, prohibited racial discrimination in hiring in certain federally assisted programs.[3] Further, Congress was aware that most agencies dispensing federal funds already had "authority to refuse or terminate assistance for failure to comply with a variety of requirements imposed by statute or by administrative action." [4] But Congress was plainly dissatisfied with agency efforts to ensure the nondiscriminatory use of federal funds; [5] and the predicate for

---

[2] 110 Cong. Rec. 6544 (1964) (Sen. Humphrey). Senator Humphrey noted President Kennedy's message of June 19, 1963:

" 'Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination.' " *Id.*, at 6543.

[3] See, *e. g.*, Exec. Order No. 8802, 3 CFR 957 (1938–1943 Comp.) (Pres. Roosevelt); Exec. Order No. 10210, 3 CFR 390 (1949–1953 Comp.) (Pres. Truman); Exec. Order No. 10479, 3 CFR 961 (1949–1953 Comp.) (Pres. Eisenhower); Exec. Order No. 10925, 3 CFR 448 (1959–1963 Comp.) (Pres. Kennedy).

[4] 110 Cong. Rec. 6546 (1964) (Sen. Humphrey).

[5] Thus, Senator Humphrey noted:

"Much has been done by the executive branch to eliminate racial discrimination from federally assisted programs. President Kennedy, by Executive order, prohibited such discrimination in federally assisted housing, and in employment on federally assisted construction. Individual agencies have taken effective action for the programs they administer." *Id.*, at 6544.

Nonetheless,

"President after President has announced that national policy is to end discrimination in Federal programs and Federal assistance. But, regrettably, there has been open violation of these policies." *Id.*, at 6543.

Title VI was the belief that "the time [had] come . . . to declare a broad principle that is right and necessary, and to make it effective for every Federal program involving financial assistance by grant, loan or contract." [6]

Far from conferring new private authority to enforce the federal policy of nondiscrimination, Title VI contemplated agency action to be the principal mechanism for achieving this end. The proponents of Title VI stressed that it did not "confer sweeping new authority, of undefined scope, to Federal departments and agencies," but instead was intended to require the exercise of existing authority to end discrimination by fund recipients, and to furnish the procedure for this purpose. [7] Thus, § 601 states the federal policy of nondiscrimination, and § 602 mandates that the agencies achieve compliance by refusing to grant or continue assistance or by "any other means authorized by law." Under § 602, cutting off funds is forbidden unless the agency determines "that compliance cannot be secured by voluntary means." As Senator Humphrey explained:

> "[Title VI] encourages Federal departments and agencies to be resourceful in finding ways of ending discrimination voluntarily without forcing a termination of funds needed for education, public health, social welfare, disaster relief,

---

[6] *Id.*, at 6544. Enactment of Title VI would remove "any conceivable doubts" as to the authority of agencies to eliminate discrimination in the programs they funded and "give express legislative support to the agency's actions. . . . [S]ome federal agencies appear to have been reluctant to act in this area. Title VI will require them to act." *Ibid.* Senator Humphrey further explained that "[i]n connection with various Federal programs of aid to higher education, language institutes, research grants to colleges, and the like, Title VI would . . . authorize requirements of nondiscrimination. In a number of programs, such action has already been taken." *Id.*, at 6546.

[7] *Ibid.* Senator Humphrey noted that "existing statutory authority is, however, not surrounded by the procedural safeguards which Title VI provides." *Ibid.*

and other urgent programs. Cutoff of funds needed for such purposes should be the last step, not the first, in an effective program to end racial discrimination." 110 Cong. Rec. 6546 (1964).[8]

To be sure, Congress contemplated that there would be litigation brought to enforce Title VI. The "other means" provisions of § 602 include agency suits to enforce contractual antidiscrimination provisions and compliance with agency regulations, as well as suits brought by the Department of Justice under Title IV of the 1964 Act, where the recipient is a public entity.[9] Congress also knew that there would be private suits

---

[8] See also *id.*, at 6544:

"Moreover, the purpose of Title VI is not to cut off funds, but to end racial discrimination. . . . In general, cutoff of funds would not be consistent with the objectives of the Federal assistance statute if there are available other effective means of ending discrimination. And section 602, by authorizing the agency to achieve compliance 'by any other means authorized by law' encourages agencies to find ways to end racial discrimination without refusing or terminating assistance."

[9] See *id.*, at 7066 (Sen. Ribicoff):

"[An] agency could, for example, ask the Attorney General to initiate a lawsuit under title IV, if the recipient were a school district or public college; or the agency could use any of the remedies available to it by virtue of its own 'rule, regulation, or order of general applicability.' For example, the most effective way for an agency to proceed would often be to adopt a rule that made the nondiscrimination requirement part of a contractual obligation on the part of the recipient . . . or . . . the agency would have authority to sue to enforce compliance with its own regulations."

The mention of "lawsuits," *id.*, at 7067, by Senator Ribicoff, on which the Court relies, see *ante*, at 705 n. 38, 712 n. 49, was in reference to the foregoing. As the Senator pointed out: "All of these remedies have the obvious advantage of seeking to end the discrimination, rather than to end the assistance." 110 Cong. Rec. 7066 (1964).

By regulation, see 45 CFR §§ 80.8 (a), 86.71 (1978), HEW has provided that "other means" in § 602 include referral to the Department of Justice for enforcement of rights of the United States under any statute or contractual undertaking.

to enforce § 601; but these suits were not authorized by § 601 itself but by 42 U. S. C. § 1983.[10] Every excerpt from the legislative history cited by the Court shows full awareness that private suits could redress discrimination contrary to the Constitution and Title VI, if the discrimination were imposed by public agencies; not one statement suggests contemplation of lawsuits against recipients not acting under color of state law.[11] Senator Humphrey was quite correct in asserting that the individual's "right to go to court and institute suit" for violation of the Fourteenth Amendment or § 601, see *ante,* at 712–714, n. 49, was not limited by the presence of alternative enforcement mechanisms in § 602. Section 1983 provides a private remedy for deprivations under color of state law of any rights "secured by the Constitution and laws," and nothing in Title VI suggests an intent to create an exception to this historic remedy for vindication of federal rights as against

[10] For instance, the Court quotes Senator Humphrey's statement that "litigation by private parties [would be among] the primary means of securing compliance" with § 601, *ante,* at 712 n. 49. But reference to the Senator's entire remarks shows he was contemplating suits under § 1983. The "[r]acial segregation . . . prohibited by the Constitution" and "litigation . . . under Title IV of the 1964 Civil Rights Act," 110 Cong. Rec. 6545 (1964), were limited to discrimination under color of law and did not reach discrimination by private parties. Congress was well aware of § 1983 suits against public agencies brought to enforce this prohibition. See *id.,* at 5247–5256.

[11] The Court, *ante,* at 711–712, n. 48, appears to rely on a statement by Senator Humphrey citing *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F. 2d 959 (CA4 1963), cert. denied, 376 U. S. 938 (1964), as support for the proposition that Title VI created a new private remedy. But *Simkins* was brought under 42 U. S. C. § 1983. See *University of California Regents* v. *Bakke,* 438 U. S. 265, 383–385 (1978) (separate opinion of WHITE, J.). In any event, although there is no doubt that in enacting Title VI Congress intended to proscribe private discrimination, the excerpt quoted by the Court does not suggest that Congress contemplated a private individual remedy against all discrimination thus prohibited. To the contrary, Senator Humphrey recognized the uncertain status of *Simkins* as authoritative exposition of § 1983 and the Fourteenth Amendment.

contrary state action.[12]  The legislative history shows, however, that Congress did not intend to add to this already existing private remedy.  Particularly, Congress did not intend to create a private remedy for discrimination practiced not under color of state law but by private parties or institutions.[13]

---

[12] Indeed, 42 U. S. C. § 2000c–8, enacted as part of the 1964 Act, expressly preserves pre-existing private remedies against discrimination "in public education," which would include the remedies provided by § 1983.

Although concluding that Title IX and Title VI confer private causes of action, the Court refrains from addressing the permissible *remedies* available under such a cause of action.  Thus, the Court focuses on suits requesting, as injunctive relief, that individuals allegedly discriminated against be admitted to federally assisted educational programs, but does not explicitly foreclose the possibility of a suit against either a recipient institution or a federal funding agency to require termination of funding of the allegedly discriminatory program.  In at least two cases apparently brought directly under § 601, both of which are approvingly cited by the Court, the recipient of funds was enjoined from continuing the federally assisted project, and HUD was enjoined to terminate funding.  *Blackshear Residents Org.* v. *Housing Authority of Austin,* 347 F. Supp. 1138, 1150 (WD Tex. 1972); *Hicks* v. *Weaver,* 302 F. Supp. 619, 628 (ED La. 1969).  Such intervention by federal courts at the behest of private parties cannot be reconciled with the numerous procedural safeguards provided in § 602, see *University of California Regents* v. *Bakke, supra,* at 381–383 (separate opinion of WHITE, J.).  The § 1983 cause of action does not encompass the remedy of funding termination, for it permits only such legal or equitable relief as is appropriate to "redress" the "deprivation" of the right.  Cf. *Cumming* v. *Richmond County Board of Ed.,* 175 U. S. 528 (1899).

[13] In addition to citations in my separate opinion in *University of California Regents* v. *Bakke, supra,* at 385–386, and n. 4, see, *e. g.,* 110 Cong. Rec. 5256 (1964):

"Mr. CASE.  [Section 602] is not intended to limit the rights of individuals, *if they have any way of enforcing their rights apart from the provisions of the bill,* by way of suit or any other procedure.  The provision of the bill is not intended to cut down any rights that exist."

"Mr. HUMPHREY.  I thoroughly agree with the Senator insofar as an individual is concerned. . . ."

The remainder of this colloquy is excerpted in the Court's opinion, *ante,* at 714 n. 49.

## II

The Court further concludes that even if it cannot be persuasively demonstrated that Title VI created a private right of action, nonetheless this remedy should be inferred in Title IX because prior to its enactment several lower courts had entertained private suits to enforce the prohibition on racial discrimination in Title VI. Once again, however, there is confusion between the existing § 1983 right of action to remedy denial of federal rights under color of state law—which, as Congress recognized,[14] would encompass suits to enforce the nondiscrimination mandate of § 601—and the creation of a new right of action against private discrimination. In the case the Court relies upon most heavily, *Bossier Parish School Board* v. *Lemon,* 370 F. 2d 847 (CA5), cert. denied, 388 U. S. 911 (1967), the plaintiff class had alleged racial discrimination in violation of both Title VI and the Fourteenth Amendment, and, accordingly, the Attorney General was allowed to intervene under Title IV of the 1964 Act. In concluding that plaintiffs could sue to enforce § 601, the Court of Appeals expressed its view that this prohibition merely repeated "the law as laid down in hundreds of decisions, independent of the statute." 370 F. 2d, at 852. Clearly, the defendant was in violation of "the law . . . independent of the statute" only because it was a state entity, and the court was correct in concluding that § 602 did not withdraw the already existing right to sue to enforce this prohibition. However, to the extent the court based its holding on the proposition that an individual protected by a statute always has a right to enforce that statute,[15] it was in error;[16] and an

---

[14] See § 718 of the Education Amendments of 1972, 20 U. S. C. § 1617; *infra,* at 727.

[15] See 370 F. 2d, at 852 ("In the absence of a procedure through which the individuals protected by section 601's prohibition may assert their rights under it, violations of the law are cognizable by the courts").

[16] Prior to enactment of Title IX, two District Courts directly or indirectly relied on *Bossier* in holding that aggrieved individuals could sue

erroneous interpretation of Title VI should not be compounded through importation into Title IX under the guise of effectuating legislative intent. There is not one statement in the legislative history indicating that the Congress that enacted Title IX was aware of the *Bossier* litigation, much less that it adopted the particular theory relied on to uphold plaintiffs' standing in that case.[17]

---

to enforce § 601, but in both of these cases the defendant was acting under color of state law. *Gautreaux* v. *Chicago Housing Authority,* 265 F. Supp. 582, 583–584 (ND Ill. 1967), followed what it believed to be the holding of *Bossier* that individuals had "standing" to enforce § 601 even though the Seventh Circuit in *Green Street Assn.* v. *Daley,* 373 F. 2d 1, 8–9, cert. denied, 387 U. S. 932 (1967), had previously declined to express its agreement with this aspect of *Bossier. Blackshear Residents Org.* v. *Housing Authority of Austin, supra,* at 1140, in turn relied on *Gautreaux.* Subsequent decisions in the *Gautreaux* v. *Chicago Housing Authority* litigation expressly noted that plaintiffs sought relief under § 1983 in every count of their complaint, see 296 F. Supp. 907, 908 (ND Ill. 1969), and 436 F. 2d 306, 307 (CA7 1970) (aff'g 296 F. Supp. 907), cert. denied, 402 U. S. 922 (1971). The one case cited by the Court that was a suit against a private organization did not mention the cause-of-action issue. *Hawthorne* v. *Kenbridge Recreation Assn., Inc.,* 341 F. Supp. 1382 (ED Va. 1972).

[17] In addition to *Bossier,* the cases discussed in n. 16, *supra,* and cases explicitly holding that the cause of action was provided by § 1983, see the Court's opinion, *ante,* at 696–697, n. 21, the Court relies on cases involving suits against federal officials. Contrary to the Court's assertion, see *ibid.,* none of these cases held that there is a direct cause of action to enforce § 601. In *Shannon* v. *Department of Housing and Urban Development,* 436 F. 2d 809, 818–819, 820 (CA3 1970), the court concluded that allegations of failure to act with respect to specific instances of discrimination were reviewable under the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.* Similarly, *Southern Christian Leadership Conference, Inc.* v. *Connolly,* 331 F. Supp. 940, 943 (ED Mich. 1971), cited *ante,* at 696 n. 20, 697 n. 21, explicitly held that standing was based on § 10 of the Administrative Procedure Act, 5 U. S. C. § 702, and cited *Bossier* only in a discussion of exhaustion of administrative remedies. Neither *Gautreaux* v. *Romney,* 448 F. 2d 731 (CA7 1971), later appeal, *Gautreaux* v. *Chicago Housing Authority,* 503 F. 2d 930 (CA7 1974), aff'd *sub nom. Hills* v. *Gautreaux,* 425 U. S. 284 (1976), nor *Hicks* v. *Weaver,* 302 F. Supp. 619

The Court's reliance on § 718 of the 1972 Act, 20 U. S. C. § 1617, is likewise misplaced. That provision authorizes attorney's fees to the prevailing party other than the United States upon the entry of a final order by a federal court "against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter"—which deals with emergency school aid, 20 U. S. C. §§ 1601–1619—"or for discrimination on the basis of race, color, or national origin in violation of Title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education." Based on this provision, it is argued that Title VI itself must have authorized private actions. However, whatever may be the value of the opinion of Congress in 1972 as to the meaning of the 1964 Civil Rights Act, the attorney's fees provision— far from intimating the existence of a remedy against private discrimination—refers only to suits against public institutions. Insofar as the provision refers to "discrimination . . . in violation of Title VI," one must strain to conclude that this was meant to encompass private suits against federal agencies whose mandate under Title VI was to enforce § 601's nondiscrimination provision applicable to all recipients of federal funds. Rather, in referring to Title VI and the Fourteenth Amendment, § 718 did no more than provide for fees in § 1983 suits brought to end discrimination under color of state law.[18]

---

(ED La. 1969), contains any discussion of the cause-of-action issue or even suggests that the question of the appropriate standard for reviewing such federal funding decisions had been raised.

[18] There is no basis for the Court's suggestion that at the time § 718 was enacted § 1983 was not available for suits against state or local educational agencies, see *ante,* at 700 n. 27. As described last Term in *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 663 nn. 5, 6 (1978), we had never indicated that suits such as *Brown* v. *Board of Education,* 347 U. S. 483 (1954), or *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971), might not be appropriate despite the holding in *Monroe* v. *Pape,* 365 U. S. 167 (1961), that local governments were not

## III

The legislative intent not to create a new private remedy for enforcement of Title VI or Title IX cannot be ignored simply because in other cases involving analogous language the Court has recognized private remedies. The recent cases inferring a private right of action to enforce various civil rights statutes relied not merely upon the statutory language granting the right sought to be enforced, but also upon the clear compatibility, despite the absence of an explicit legislative mandate, between private enforcement and the legislative purpose demonstrated in the statute itself. Having concluded that 42 U. S. C. § 1982 prohibited private as well as public racial discrimination in the sale or lease of property, the Court had little choice but to hold that aggrieved individuals could enforce this prohibition, for there existed no other remedy to redress such violations of the statute.[19] The Court's reliance on *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969), is equally unwarranted. The cause of action there recognized— for declaratory relief that a voting change is subject to the authorization requirements of § 5 of the Voting Rights Act of 1965, 42 U. S. C. § 1973c—served to trigger the enforcement mechanism provided in the statute itself. The Court pointedly declined to infer a private cause of action to enforce the suspension requirement of § 4 of the Act, 393 U. S., at 552–

"persons" within the meaning of § 1983. It was not until 1973, after passage of both Title IX and § 718, that the principle of municipal immunity established in *Monroe* was extended to suits for injunctive relief. See *Kenosha* v. *Bruno,* 412 U. S. 507 (1973). Even as the Court unpersuasively suggests that Congress might not have thought that private suits to remedy segregation in violation of the Fourteenth Amendment were available in 1972, it notes the furor in Congress at this time over busing as a desegregation remedy, see *ante,* at 701 n. 29.

[19] See *Sullivan* v. *Little Hunting Park,* 396 U. S. 229 (1969); *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968). Cf. *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 459–460 (1975) (implied cause of action under 42 U. S. C. § 1981).

554; nor may those allegedly discriminated against bring suit to test voting changes in covered units against the substantive standard of § 5, either directly or through judicial review of the Attorney General's preclearance decision, *Morris* v. *Gressette,* 432 U. S. 491 (1977). The cause of action granted today is of a very different nature. It does not trigger the enforcement scheme provided in §§ 902 and 903, 20 U. S. C. §§ 1682, 1683, but entirely displaces that scheme in favor of a different approach.[20]

Congress decided in Title IX, as it had in Title VI, to prohibit certain forms of discrimination by recipients of federal funds. Where those recipients were acting under color of state law, individuals could obtain redress in the federal courts for violation of these prohibitions. But, excepting post-Civil War enactments dealing with racial discrimination in specified situations, these forms of discrimination by private entities had not previously been subject to individual redress under federal law, and Congress decided to reach such discrimination not by creating a new remedy for individuals, but by relying on the authority of the Federal Government to enforce the terms under which federal assistance would be provided.

---

[20] At the time *Allen* was decided, the Department of Justice in enforcing the Voting Rights Act had not provided any formal means by which an individual could initiate review by the Department of a change affecting voting in an area covered by § 5. Since 1971, the Department has officially urged private parties to inform it of voting law changes in covered areas. 28 CFR §§ 51.12–51.15 (1978); 36 Fed. Reg. 18186 (1971). The Department of Health, Education, and Welfare has provided by regulation that any person may file a written complaint alleging discrimination in violation of Titles VI or IX within 180 days of the occurrence of the discrimination, and that after investigation HEW shall seek compliance, formally or informally, or shall inform the complainant in writing that further agency action is unwarranted. 45 CFR §§ 80.7 (b), (c), 86.71 (1978). The federal respondents have represented to the Court that they would, "of course, fulfill their responsibility under applicable regulations to conduct an administrative investigation of petitioner's charges" should this Court affirm the decision below. Brief for Federal Respondents 54 n. 33.

Whatever may be the wisdom of this approach to the problem of private discrimination, it was Congress' choice, not to be overridden by this Court.

MR. JUSTICE POWELL, dissenting.

I agree with MR. JUSTICE WHITE that even under the standards articulated in our prior decisions, it is clear that no private action should be implied here. It is evident from the legislative history reviewed in his dissenting opinion that Congress did not intend to create a private action through Title IX of the Education Amendments of 1972. It also is clear that Congress deemed the administrative enforcement mechanism it did create fully adequate to protect Title IX rights. But as mounting evidence from the courts below suggests, and the decision of the Court today demonstrates, the mode of analysis we have applied in the recent past cannot be squared with the doctrine of the separation of powers. The time has come to reappraise our standards for the judicial implication of private causes of action.[1]

Under Art. III, Congress alone has the responsibility for determining the jurisdiction of the lower federal courts. As the Legislative Branch, Congress also should determine when private parties are to be given causes of action under legislation it adopts. As countless statutes demonstrate, including Titles of the Civil Rights Act of 1964,[2] Congress recognizes that the creation of private actions is a legislative function and frequently exercises it. When Congress chooses not to provide a private civil remedy, federal courts should

---

[1] The phrase "private cause of action" may not have a completely clear meaning. As the term is used herein, I refer to the right of a private party to seek judicial relief from injuries caused by another's violation of a legal requirement. In the context of legislation enacted by Congress, the legal requirement involved is a statutory duty.

[2] See 42 U. S. C. § 2000a–3 (Title II; limited to preventive relief); §§ 2000e–5 (f), (g) (Title VII; administrative preclearance required).

not assume the legislative role of creating such a remedy and thereby enlarge their jurisdiction.

The facts of this case illustrate the undesirability of this assumption by the Judicial Branch of the legislative function. Whether every disappointed applicant for admission to a college or university receiving federal funds has the right to a civil-court remedy under Title IX is likely to be a matter of interest to many of the thousands of rejected applicants. It certainly is a question of vast importance to the entire higher educational community of this country. But quite apart from the interests of the persons and institutions affected, respect for our constitutional system dictates that the issue should have been resolved by the elected representatives in Congress after public hearings, debate, and legislative decision. It is not a question properly to be decided by relatively uninformed federal judges who are isolated from the political process.

In recent history, the Court has tended to stray from the Art. III and separation-of-powers principle of limited jurisdiction. This, I believe, is evident from a review of the more or less haphazard line of cases that led to our decision in *Cort* v. *Ash*, 422 U. S. 66 (1975). The "four factor" analysis of that case is an open invitation to federal courts to legislate causes of action not authorized by Congress. It is an analysis not faithful to constitutional principles and should be rejected. Absent the most compelling evidence of affirmative congressional intent, a federal court should not infer a private cause of action.

I

The implying of a private action from a federal regulatory statute has been an exceptional occurrence in the past history of this Court. A review of those few decisions where such a step has been taken reveals in almost every case special historical circumstances that explain the result, if not the Court's analysis. These decisions suggest that the doctrine of

implication applied by the Court today not only represents judicial assumption of the legislative function, but also lacks a principled precedential basis.

### A

The origin of implied private causes of actions in the federal courts is said to date back to *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33 (1916). A close look at the facts of that case and the contemporary state of the law indicates, however, that *Rigsby*'s reference to the "inference of a private right of action," *id.,* at 40, carried a far different connotation than the isolated passage quoted by the Court, *ante,* at 689 n. 10, might suggest. The narrow question presented for decision was whether the standards of care defined by the Federal Safety Appliance Act's penal provisions applied to a tort action brought against an interstate railroad by an employee not engaged in interstate commerce at the time of his injury. The jurisdiction of the federal courts was not in dispute, the action having been removed from state court on the ground that the defendant was a federal corporation. See *Moore* v. *Chesapeake & O. R. Co.,* 291 U. S. 205, 215 n. 6 (1934). Under the regime of *Swift* v. *Tyson,* 16 Pet. 1 (1842), then in force, the Court was free to create the substantive standards of liability applicable to a common-law negligence claim brought in federal court. The practice of judicial reference to legislatively determined standards of care was a common expedient to establish the existence of negligence. See Thayer, Public Wrong and Private Action, 27 Harv. L. Rev. 317 (1914). *Rigsby* did nothing more than follow this practice, and cannot be taken as authority for the judicial creation of a cause of action not legislated by Congress. *Moore* v. *Chesapeake & O. R. Co., supra,* at 215–216; *Jacobson* v. *New York, N. H. & H. R. Co.,* 206 F. 2d 153, 157–158 (CA1 1953) (Magruder, C. J.), aff'd *per curiam,* 347 U. S. 909 (1954).

For almost 50 years after *Rigsby,* this Court recognized an implied private cause of action in only one other statutory context.[3] Four decisions held that various provisions of the Railway Labor Act of 1926 could be enforced in a federal court. The case for implication of judicial remedies was especially strong with respect to this Act, as Congress had repealed its predecessor, Title III of the Transportation Act of 1920, after *Pennsylvania R. Co.* v. *Railroad Labor Board,* 261 U. S. 72 (1923), and *Pennsylvania Federation* v. *Pennsylvania R. Co.,* 267 U. S. 203 (1925), had held that judicial enforcement of its terms was not available. Convinced that Congress had meant to accomplish more through the 1926 Act, and faced with the absence of an express administrative or judicial enforcement mechanism, the Court in *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548 (1930), upheld an injunction enforcing the Act's prohibition of employer interference in employees' organizational activities. Buttressed by 1934 amendments to the Act that indicated congressional approval of this step, the Court in *Virginian R.*

---

[3] During this period, the Court did uphold the implication of civil remedies in favor of the Government, see *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191 (1967); *United States* v. *Republic Steel Corp.,* 362 U. S. 482 (1960), and strongly suggested that private actions could be implied directly from particular provisions of the Constitution, *Bell* v. *Hood,* 327 U. S. 678, 684 (1946). See also *Jacobs* v. *United States,* 290 U. S. 13 (1933). Both of these issues are significantly different from the implication of a private remedy from a federal statute. In *Wyandotte* and *Republic Steel,* the Government already had a "cause of action" in the form of its power to bring criminal proceedings under the pertinent statutes. Thus, the Court was confronted only with the question whether the Government could exact less drastic civil penalties as an alternative means of enforcing the same obligations. And this Court's traditional responsibility to safeguard constitutionally protected rights, as well as the freer hand we necessarily have in the interpretation of the Constitution, permits greater judicial creativity with respect to implied constitutional causes of action. Moreover, the implication of remedies to enforce constitutional provisions does not interfere with the legislative process in the way that the implication of remedies from statutes can. See Part III, *infra.*

*Co.* v. *Railway Employees,* 300 U. S. 515 (1937), extended judicial enforcement to the Act's requirement that an employer bargain with its employees' authorized representative. Finally, in *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192 (1944), and *Tunstall* v. *Locomotive Firemen & Enginemen,* 323 U. S. 210 (1944), the Court further held that the duty of a union not to discriminate among its members also could be enforced through the federal courts.[4] In each of these cases enforcement of the Act's various requirements could have been restricted to actions brought by the Board of Mediation (later the Mediation Board), rather than by private parties. But whatever the scope of the judicial remedy, the implication of some kind of remedial mechanism was necessary to provide the enforcement authority Congress clearly intended.[5]

---

[4] The Act did not refer expressly to an obligation not to discriminate, but in light of its structure, especially its vesting in an authorized union the power to exclude all others from representing employees, the Court felt compelled to imply this duty. This construction of the Act was necessary to avoid a difficult constitutional question, namely, the applicability of the Constitution's prohibition of racial discrimination to a private party enjoying a statutorily created status as an exclusive bargaining agent. See *Steele* v. *Louisville & N. R. Co.,* 323 U. S., at 202–203; *id.,* at 208–209 (Murphy, J., concurring).

[5] The Court states that a private cause of action also was implied in *Machinists* v. *Central Airlines,* 372 U. S. 682 (1963), a case involving an amendment of the Railway Labor Act applicable to airlines. *Ante,* at 692–693, n. 13. A careful reading of that case suggests that it presented a somewhat different question. Under § 204 of the 1936 amendments to the Act, boards of adjustment were established to resolve labor grievances. The Court held that a claim based on a collective-bargaining agreement that had been interpreted by such a board presented a federal question under 28 U. S. C. § 1331. The cause of action came directly from the agreement, not from any provision of the Act, and the only issue was whether this already existing private cause of action could be brought in a federal court. See Mishkin, The Federal "Question" in the District Courts, 53 Colum. L. Rev. 157, 166 (1953). Cf. *Smith* v. *Kansas City Title & Trust Co.,* 255 U. S. 180 (1921). Although as a practical matter this result entails many of the same problems involved in the implication

During this same period, the Court frequently turned back private plaintiffs seeking to imply causes of action from federal statutes. See, *e. g., Wheeldin* v. *Wheeler,* 373 U. S. 647 (1963); *T. I. M. E. Inc.* v. *United States,* 359 U. S. 464 (1959); *General Committee* v. *Southern Pacific Co.,* 320 U. S. 338 (1943); *General Committee* v. *Missouri–K.–T. R. Co.,* 320 U. S. 323 (1943); *Switchmen* v. *National Mediation Board,* 320 U. S. 297 (1943). Throughout these cases, the focus of the Court's inquiry generally was on the availability of means other than a private action to enforce the statutory duty at issue. Even in cases where the statute might be said to have been enacted for the benefit of a special class comprising the plaintiff, the factor to which the Court today attaches so much importance, *ante,* at 689–693, and n. 13, the Court refused to create a private action if Congress had provided some other means of enforcing such duties. See, *e. g., Switchmen* v. *National Mediation Board, supra,* at 300–301.

A break in this pattern occurred in *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964). There the Court held that a private party could maintain a cause of action under § 14 (a) of the Securities Exchange Act of 1934, in spite of Congress' express creation of an administrative mechanism for enforcing that statute. I find this decision both unprecedented [6] and

of a private cause of action, see n. 17, *infra,* at least analytically the problems are quite different.

[6] None of the authorities cited in the opinion supports the result. *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173 (1942), and *Deitrick* v. *Greaney,* 309 U. S. 190 (1940), held that federal law could limit a state-law defense to a state-law cause of action. *Deckert* v. *Independence Shares Corp.,* 311 U. S. 282 (1940), held that a federal judge could devise equitable remedies to supplement an expressly created private action for damages. Similarly, *Mitchell* v. *Robert DeMario Jewelry, Inc.,* 361 U. S. 288 (1960); *Schine Chain Theatres, Inc.* v. *United States,* 334 U. S. 110 (1948); and *Porter* v. *Warner Holding Co.,* 328 U. S. 395 (1946), upheld various equitable remedies devised under an express equitable cause of action. As already noted, *Bell.* v. *Hood* involved the implication of a private action from a constitutional provision, and *Tunstall* v. *Locomotive*

incomprehensible as a matter of public policy. The decision's rationale, which lies ultimately in the judgment that "[p]rivate enforcement of the proxy rules provides a necessary supplement to Commission action," 377 U. S., at 432, ignores the fact that Congress, in determining the degree of regulation to be imposed on companies covered by the Securities Exchange Act, already had decided that private enforcement was unnecessary. More significant for present purposes, however, is the fact that *Borak,* rather than signaling the start of a trend in this Court, constitutes a singular and, I believe, aberrant interpretation of a federal regulatory statute.

Since *Borak,* this Court has upheld the implication of private causes of actions derived from federal statutes in only three extremely limited sets of circumstances. First, the Court in *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968); *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229 (1969); and *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454 (1975), recognized the right of private parties to seek relief for violations of 42 U. S. C. §§ 1981 and 1982. But to say these cases "implied" rights of action is somewhat misleading, as Congress at the time these statutes were enacted expressly referred to private enforcement actions.[7] Furthermore, as in

---

*Firemen & Enginemen,* 323 U. S. 210 (1944), was grounded on a statute that provided no express means of enforcement. None of these cases condoned the implication of a private action in circumstances where alternative means of enforcement were available. Although I do not suggest that we should consider overruling *Borak* at this late date, cf. *Flood* v. *Kuhn,* 407 U. S. 258 (1972), the lack of precedential support for this decision militates strongly against its extension beyond the facts of the case. Cf. *Santa Fe Industries* v. *Green,* 430 U. S. 462, 477 (1977); *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 737 (1975).

[7] Both § 1981 and § 1982 are derived from § 1 of the Civil Rights Act of 1866, which was re-enacted in pertinent part in §§ 16 and 18 of the Civil Rights Act of 1870. Section 3 of the 1866 Act provided:

"[T]he district courts of the United States . . . shall have . . . cognizance . . . of all causes, civil and criminal, affecting persons who are denied . . . any of the rights secured to them by the first section of this

the Railway Labor Act cases, Congress had provided no alternative means of asserting these rights. Thus, the Court was presented with the choice between regarding these statutes as precatory or recognizing some kind of judicial proceeding.

Second, the Court in *Allen* v. *State Board of Elections*, 393 U. S. 544 (1969), permitted private litigants to sue to enforce the preclearance provisions of § 5 of the Voting Rights Act of 1965. As the Court seems to concede, this decision was reached without substantial analysis, *ante,* at 690, and n. 12, and in my view can be explained only in terms of this Court's special and traditional concern for safeguarding the electoral process.[8] In addition, as MR. JUSTICE WHITE notes, the

act . . . . The jurisdiction in civil and criminal matters hereby conferred on the district and circuit courts of the United States shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where such laws are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offences against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of the cause . . . is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern said courts in the trial and disposition of such cause . . . ." 14 Stat. 27.

Section 18 of the 1870 Act made this section applicable to § 16 of the later Act. Subsequently Congress, through § 1 of the Civil Rights Act of 1871, indicated in even more explicit terms that private actions would be available to prevent official interference with the rights guaranteed by § 1 of the 1866 Act. See *Chapman* v. *Houston Welfare Rights Org., ante,* at 627–628 (POWELL, J., concurring). Although one might conclude, in light of the 1871 Act, that the 1866 and 1870 Acts did not provide for private actions but merely permitted federal courts to entertain state-law actions affecting the denial of civil rights, an equally plausible reading of those statutes is that Congress created a federal cause of action to enforce § 1 of the 1866 Act.

[8] See, *e. g., Williams* v. *Rhodes,* 393 U. S. 23 (1968); *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Baker* v. *Carr,* 369 U. S. 186 (1962); Wilkinson, The Supreme Court, The Equal Protection Clause, and the Three Faces of Constitutional Equality, 61 Va. L. Rev. 945, 956–976 (1975). Cf. *United*

remedy implied was very limited, thereby reducing the chances that States would be exposed to frivolous or harassing suits.[9]

Finally, the Court in *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S. 6 (1971), ratified 25 years of lower-court precedent that had held a private cause of action available under the Securities and Exchange Commission's Rule 10b–5. As the Court concedes, *ante*, at 692 n. 13, this decision reflects the unique history of Rule 10b–5, and did not articulate any standards of general applicability.

These few cases applying *Borak* must be contrasted with the subsequent decisions where the Court refused to imply private actions. In *Calhoon* v. *Harvey*, 379 U. S. 134 (1964), the Court refused to permit private suits in derogation of administrative remedies to enforce Title IV of the Labor-Management Reporting and Disclosure Act of 1959, in spite of that statute's command, *inter alia*, that "every member in good standing . . . shall have the right to vote for or otherwise support the candidate or candidates of his choice . . . ." 29 U. S. C. § 481 (e).[10] In *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers*, 414 U. S. 453 (1974), the Court reversed a lower court's implication of a private action to challenge violations of the Rail Passenger Service Act of 1970, in light of the Attorney General's express enforcement authority. And in *Securities Investor Protection Corp.* v. *Barbour*, 421 U. S. 412 (1975), we refused to allow private actions under the Securities Investor Protection Act

---

*States* v. *Carolene Products Co.*, 304 U. S. 144, 152–153 n. 4 (1938) (Stone, J., concurring). See also *United States* v. *Richardson*, 418 U. S. 166, 195 n. 17 (1974) (POWELL, J., concurring).

[9] See *ante*, at 728–729.

[10] Section 402 of the Act created an administrative procedure for investigating violations of Title IV and permitted the Secretary of Labor to sue in federal court to obtain relief. Section 403 of the Act stated that the administrative remedy was the exclusive means of challenging "an election already conducted" but did not limit attempts to obtain prospective relief, the object of the suit in *Calhoon*.

of 1970, which also was enforceable by administrative proceedings and Government suits.[11]

## B

It was against this background of almost invariable refusal to imply private actions, absent a complete failure of alternative enforcement mechanisms and a clear expression of legislative intent to create such a remedy, that *Cort* v. *Ash,* 422 U. S. 66 (1975), was decided. In holding that no private action could be brought to enforce 18 U. S. C. § 610 (1970 ed. and Supp. III), a criminal statute, the Court referred to four factors said to be relevant to determining generally whether private actions could be implied. 422 U. S., at 78.[12] As MR.

---

[11] Since *Borak,* the Court also has entertained several cases involving challenges to various state welfare programs based in part on the Social Security Act. See, *e. g., Rosado* v. *Wyman,* 397 U. S. 397 (1970); *King* v. *Smith,* 392 U. S. 309 (1968). Most of these decisions did not confront the cause-of-action issue at all; none of them addressed the question whether a private cause of action could be implied. In some instances there were conclusory, and in my view incorrect, statements to the effect that 42 U. S. C. § 1983 might provide a basis for asserting these claims. See *Chapman* v. *Houston Welfare Rights Org., ante,* at 644-646. (POWELL, J., concurring.) The silence of these decisions with respect to inferring a private cause of action cannot be taken as authority for the implication of one.

[12] The Court stated its analysis as follows:

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458, 460 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412, 423 (1975); *Calhoon* v. *Harvey,* 379 U. S. 134 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action

JUSTICE WHITE suggests, *ante,* at 718–719, and n. 1, these factors were meant only as guideposts for answering a single question, namely, whether Congress intended to provide a private cause of action. The conclusion in that particular case was obvious. But, as the opinion of the Court today demonstrates, the *Cort* analysis too easily may be used to deflect inquiry away from the intent of Congress, and to permit a court instead to substitute its own views as to the desirability of private enforcement.

Of the four factors mentioned in *Cort,* only one refers expressly to legislative intent. The other three invite independent judicial lawmaking. Asking whether a statute creates a right in favor of a private party, for example, begs the question at issue. What is involved is not the mere existence of a legal right, but a particular person's right to invoke the power of the courts to enforce that right.[13] See n. 1, *supra.* Determining whether a private action would be consistent with the "underlying purposes" of a legislative scheme permits a court to decide for itself what the goals of a scheme should be, and how those goals should be advanced. See Note, 43 Ford. L. Rev. 441, 454–455, 458 (1974). Finally, looking to state law for parallels to the federal right simply focuses inquiry on a particular policy consideration that Congress already may have weighed in deciding not to create a private action.

That the *Cort* analysis too readily permits courts to over-

---

based solely on federal law? See *Wheeldin* v. *Wheeler,* 373 U. S. 647, 652 (1963); cf. *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 434 (1964); *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 394–395 (1971); *id.,* at 400 (Harlan, J., concurring in judgment)." 422 U. S., at 78.

[13] The Court attempts to avoid the question-begging nature of this inquiry by emphasizing the precise phrasing of the statute at issue. *Ante,* at 689–693, and n. 13. Aside from its failure to contend with relevant decisions that do not conform to the perceived pattern, see, *e. g., Calhoon* v. *Harvey,* 379 U. S. 134 (1964); *Switchmen* v. *National Mediation Board,* 320 U. S. 297 (1943), the Court's approach gives undue significance to essentially stylistic differences in legislative draftsmanship.

ride the decision of Congress not to create a private action is demonstrated conclusively by the flood of lower-court decisions applying it. Although from the time *Cort* was decided until today this Court consistently has turned back attempts to create private actions, see *Chrysler Corp.* v. *Brown, ante,* p. 281; *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49 (1978); *Piper* v. *Chris-Craft Industries,* 430 U. S. 1 (1977), other federal courts have tended to proceed in exactly the opposite direction. In the four years since we decided *Cort,* no less than 20 decisions by the Courts of Appeals have implied private actions from federal statutes. *Local 714, Amalgamated Transit Union* v. *Greater Portland Transit Dist.,* 589 F. 2d 1 (CA1 1978) (§ 13 (c) of Urban Mass Transportation Act of 1964); *Bratton* v. *Shiffrin,* 585 F. 2d 223 (CA7 1978) (§ 1007 (a) of Federal Aviation Act of 1958), cert. pending, No. 78–1398; *Redington* v. *Touche Ross & Co.,* 592 F. 2d 617 (CA2) (§ 17 (a) of Securities Exchange Act of 1934), cert. granted, 439 U. S. 979 (1978); *Lodge 1858, AFGE* v. *Webb,* 188 U. S. App. D. C. 233, 580 F. 2d 496 (§ 203 of National Aeronautics and Space Act of 1958), cert. denied *sub nom. Government Employees* v. *Frosch,* 439 U. S. 927 (1978); *Riggle* v. *California,* 577 F. 2d 579 (CA9 1978) (Rivers and Harbors Appropriation Act); *Lewis* v. *Transamerica Corp.,* 575 F. 2d 237 (CA9) (§ 206 of Investment Advisers Act of 1940), cert. granted, 439 U. S. 952 (1978); *Davis* v. *Southeastern Community College,* 574 F. 2d 1158 (CA4 1978) (§ 504 of Rehabilitation Act of 1973), cert. granted, 439 U. S. 1065 (1979); *Benjamins* v. *British European Airways,* 572 F. 2d 913 (CA2 1978) (Art. 28 (1) of Warsaw Convention), cert. denied, 439 U. S. 1114 (1979); *Abrahamson* v. *Fleschner,* 568 F. 2d 862 (CA2 1977) (§ 206 of Investment Advisers Act of 1940), cert. denied, 436 U. S. 913 (1978); *Association of Data Processing Service Orgs.* v. *Federal Home Loan Bank Board,* 568 F. 2d 478 (CA6 1977) (§ 11 (e) of Federal Home Loan Bank Act); *Wilson* v. *First Houston Investment Corp.,* 566 F. 2d 1235 (CA5 1978) (§ 206 of Invest-

ment Advisers Act of 1940), cert. pending, No. 77–1717; *New York Stock Exchange, Inc.* v. *Bloom,* 183 U. S. App. D. C. 217, 562 F. 2d 736 (1977) (§§ 16 and 21 of Glass-Steagall Act), cert. denied, 435 U. S. 942 (1978); *Daniel* v. *International Brotherhood of Teamsters,* 561 F. 2d 1223 (CA7 1977) (§ 17 (a) of Securities Act of 1933), rev'd on other grounds, 439 U. S. 551 (1979); *United Handicapped Federation* v. *Andre,* 558 F. 2d 413 (CA8 1977) (§ 504 of Rehabilitation Act of 1973); *Nedd* v. *United Mine Workers,* 556 F. 2d 190 (CA3 1977) (§ 302 of Labor Management Relations Act, 1947), cert. denied, 434 U. S. 1013 (1978); *Kipperman* v. *Academy Life Ins. Co.,* 554 F. 2d 377 (CA9 1977) (39 U. S. C. § 3009); *Kampmeier* v. *Nyquist,* 553 F. 2d 296 (CA2 1977) (§ 504 of Rehabilitation Act of 1973); *Lloyd* v. *Regional Transportation Authority,* 548 F. 2d 1277 (CA7 1977) (same); *McDaniel* v. *University of Chicago and Argonne,* 548 F. 2d 689 (CA7 1977) (§ 1 of Davis-Bacon Act), cert. denied, 434 U. S. 1033 (1978); *Hughes* v. *Dempsey-Tegeler & Co.,* 534 F. 2d 156 (CA9) (§ 6 of Securities Exchange Act of 1934), cert. denied, 429 U. S. 896 (1976). It defies reason to believe that in each of these statutes Congress absentmindedly forgot to mention an intended private action. Indeed, the accelerating trend evidenced by these decisions attests to the need to re-examine the *Cort* analysis.

## II

In my view, the implication doctrine articulated in *Cort* and applied by the Court today engenders incomparably greater problems than the possibility of occasionally failing to divine an unexpressed congressional intent. If only a matter of statutory construction were involved, our obligation might be to develop more refined criteria which more accurately reflect congressional intent. "But the unconstitutionality of the course pursued has now been made clear" and compels us to abandon the implication doctrine of *Cort. Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 77–78 (1938).

As the above-cited 20 decisions of the Courts of Appeals illustrate, *Cort* allows the Judicial Branch to assume policymaking authority vested by the Constitution in the Legislative Branch. It also invites Congress to avoid resolution of the often controversial question whether a new regulatory statute should be enforced through private litigation. Rather than confronting the hard political choices involved, Congress is encouraged to shirk its constitutional obligation and leave the issue to the courts to decide.[14] When this happens, the legislative process with its public scrutiny and participation has been bypassed, with attendant prejudice to everyone concerned. Because the courts are free to reach a result different from that which the normal play of political forces would have produced, the intended beneficiaries of the legislation are unable to ensure the full measure of protection their needs may warrant. For the same reason, those subject to the legislative constraints are denied the opportunity to forestall through the political process potentially unnecessary and disruptive litigation. Moreover, the public generally is denied the benefits that are derived from the making of important societal choices through the open debate of the democratic process.

The Court's implication doctrine encourages, as a corollary to the political default by Congress, an increase in the govern-

---

[14] MR. JUSTICE REHNQUIST, perhaps considering himself temporarily bound by his position in *University of California Regents* v. *Bakke,* 438 U. S. 265, 418–421 (1978) (opinion of STEVENS, J.), concurs in the Court's decision today. But writing briefly, he correctly observes "that Congress, at least during the period of the enactment of the several Titles of the Civil Rights Act, tended to rely to a large extent on the courts to *decide* whether there should be a private right of action, rather than determining this question for itself," *ante,* at 718. It does not follow, however, that this Court is obliged to indulge Congress in its refusal to confront these hard questions. In my view, the very reasons advanced by MR. JUSTICE REHNQUIST why "this Court in the future should be extremely reluctant to imply a cause of action" absent specific direction by Congress, *ibid.,* apply to this case with special force.

mental power exercised by the federal judiciary. The dangers posed by judicial arrogation of the right to resolve general societal conflicts have been manifest to this Court throughout its history. See *Schlesinger* v. *Reservists to Stop the War,* 418 U. S. 208, 222 (1974); *United States* v. *Richardson,* 418 U. S. 166, 188–197 (1974) (POWELL, J., concurring); *Eccles* v. *Peoples Bank,* 333 U. S. 426, 432 (1948); *Ashwander* v. *TVA,* 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring); *Muskrat* v. *United States,* 219 U. S. 346, 362 (1911); *Sinking-Fund Cases,* 99 U. S. 700, 718 (1879) ("One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule"); *Hayburn's Case,* 2 Dall. 409 (1792). As the Court observed only last Term:

> "Our system of government is, after all, a tripartite one, with each branch having certain defined functions delegated to it by the Constitution. While '[i]t is emphatically the province and duty of the judicial department to say what the law is,' *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803), it is equally—and emphatically—the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought.
>
> .        .        .        .        .
>
> "Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process

comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto." *TVA v. Hill,* 437 U. S. 153, 194–195 (1978).

See also *United States* v. *New York Telephone Co.,* 434 U. S. 159, 179 (1977) (STEVENS, J., dissenting) ("The principle of limited federal jurisdiction is fundamental . . .").[15]

It is true that the federal judiciary necessarily exercises substantial powers to construe legislation, including, when appropriate, the power to prescribe substantive standards of conduct that supplement federal legislation. But this power normally is exercised with respect to disputes over which a court already has jurisdiction, and in which the existence of

---

[15] Mr. Justice Frankfurter described these dangers with characteristic eloquence:

"Disregard of inherent limits in the effective exercise of the Court's 'judicial Power' . . . may well impair the Court's position as the ultimate organ of 'the supreme Law of the Land' in that vast range of legal problems, often strongly entangled in popular feeling, on which this Court must pronounce. The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements." *Baker* v. *Carr,* 369 U. S., at 267 (dissenting opinion).

Alexander Bickel identified the practical difficulties in judicial exercise of governmental power:

"The judicial process is too principle-prone and principle-bound—it has to be, there is no other justification or explanation for the role it plays. It is also too remote from conditions, and deals, case by case, with too narrow a slice of reality. It is not accessible to all the varied interests that are in play in any decision of great consequence. It is, very properly, independent. It is passive. It has difficulty controlling the stages by which it approaches a problem. It rushes forward too fast, or it lags; its pace hardly ever seems just right. For all these reasons, it is, in a vast, complex, changeable society, a most unsuitable instrument for the formation of policy." The Supreme Court and the Idea of Progress 175 (1970).

the asserted cause of action is established.[16] Implication of a private cause of action, in contrast, involves a significant additional step. By creating a private action, a court of limited jurisdiction necessarily extends its authority to embrace a dispute Congress has not assigned it to resolve. Cf. *Jacobson* v. *New York, N. H. & H. R. Co.*, 206 F. 2d 153 (CA1 1953) (Magruder, C. J.), aff'd *per curiam*, 347 U. S. 909 (1954); Note, Implying Civil Remedies From Federal Regulatory Statutes, 77 Harv. L. Rev. 285, 286–287 (1963).[17] This

---

[16] See, *e. g.*, *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715 (1979); *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448 (1957); *Clearfield Trust Co.* v. *United States*, 318 U. S. 363 (1943); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 756–832 (1973); Friendly, In Praise of *Erie*—And of the New Federal Common Law, 39 N. Y. U. L. Rev. 383 (1964).

[17] Because a private action implied from a federal statute has as an element the violation of that statute, see n. 1, *supra*, the action universally has been considered to present a federal question over which a federal court has jurisdiction under 28 U. S. C. § 1331. Thus, when a federal court implies a private action from a statute, it necessarily expands the scope of its federal-question jurisdiction.

It is instructive to compare decisions implying private causes of action to those cases that have found nonfederal causes of action cognizable by a federal court under § 1331. *E. g.*, *Smith* v. *Kansas City Title & Trust Co.*, 255 U. S. 180 (1921). Where a court decides both that federal-law elements are present in a state-law cause of action, and that these elements predominate to the point that the action can be said to present a "federal question" cognizable in federal court, the net effect is the same as implication of a private action directly from the constitutional or statutory source of the federal-law elements. Compare *Division 1287, Amalgamated Transit Union* v. *Kansas City Area Transportation Authority*, 582 F. 2d 444 (CA8 1978), cert. denied, 439 U. S. 1090 (1979); *Local 519, Amalgamated Transit Union* v. *LaCrosse Municipal Transit Utility*, 585 F. 2d 1340 (CA7 1978), with *Local 519, Amalgamated Transit Union* v. *Greater Portland Transit Dist.*, 589 F. 2d 1 (CA1 1978). To the extent an expansive interpretation of § 1331 permits federal courts to assume control over disputes which Congress did not consign to the federal judicial process, it is subject to the same criticisms of judicial implication of private actions discussed in the text.

runs contrary to the established principle that "[t]he jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation . . . ," *American Fire & Cas. Co.* v. *Finn,* 341 U. S. 6, 17 (1951), and conflicts with the authority of Congress under Art. III to set the limits of federal jurisdiction. *Lockerty* v. *Phillips,* 319 U. S. 182 (1943); *Kline* v. *Burke Construction Co.,* 260 U. S. 226 (1922); *Sheldon* v. *Sill,* 8 How. 441 (1850); *United States* v. *Nourse,* 6 Pet. 470 (1832); Wechsler, The Courts and the Constitution, 65 Colum. L. Rev. 1001, 1004–1008 (1965).

The facts of this case illustrate how the implication of a right of action not authorized by Congress denigrates the democratic process. Title IX embodies a national commitment to the elimination of discrimination based on sex, a goal the importance of which has been recognized repeatedly by our decisions. See, *e. g., Caban* v. *Mohammed, ante,* p. 380; *Orr* v. *Orr,* 440 U. S. 268 (1979); *Califano* v. *Goldfarb,* 430 U. S. 199 (1977); *Frontiero* v. *Richardson,* 411 U. S. 677 (1973); *Reed* v. *Reed,* 404 U. S. 71 (1971). But Because Title IX applies to most of our Nation's institutions of higher learning, it also trenches on the authority of the academic community to govern itself, an authority the free exercise of which is critical to the vitality of our society. See *University of California Regents* v. *Bakke,* 438 U. S. 265, 311 (1978) (opinion of POWELL, J.); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *Sweezy* v. *New Hampshire,* 354 U. S. 234, 263 (1957) (Frankfurter, J., concurring in result); Murphy, Academic Freedom—An Emerging Constitutional Right, 28 Law & Contemp. Prob. 447 (1963); Note, Academic Freedom and Federal Regulation of University Hiring, 92 Harv. L. Rev. 879 (1979). Arming frustrated applicants with the power to challenge in court his or her rejection inevitably will have a constraining effect on admissions programs. The burden of expensive, vexatious litigation upon institutions whose resources often are severely limited may well compel an emphasis on objectively measured academic qualifications

at the expense of more flexible admissions criteria that bring richness and diversity to academic life.[18]  If such a significant incursion into the arena of academic polity is to be made, it is the constitutional function of the Legislative Branch, subject as it is to the checks of the political process, to make this judgment.[19]

Congress already has created a mechanism for enforcing the mandate found in Title IX against gender-based discrimination.  At least in the view of Congress, the fund-termination power conferred on HEW is adequate to ensure that dis-

---

[18] Although the burdens of administrative regulation applied to colleges and universities through Title IX are not insubstantial, that process is at least under the control of Government officials whose personal interests are not directly implicated and whose actions are subject to congressional oversight.  Private litigation, by contrast, is subject to no such checks.

[19] We have recognized in other contexts that implication of a private cause of action can frustrate those alternative processes that exist to resolve such disputes and, given the costs of federal litigation today, may dramatically revise the balance of interests struck by the legislation.  See *Santa Fe Industries* v. *Green,* 430 U. S., at 478–479; *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S., at 739–744.  That this concern applies fully to litigation under Title IX is borne out by the facts of this case.  Petitioner's undergraduate grade-point average in basic sciences was 3.17, far below the 3.70 overall average of the University of Chicago's entering class, and her medical college admission test scores were in the bottom half of the applicant group.  More than 2,000 applicants for the 104 positions at Chicago had better academic qualifications than petitioner.  Furthermore, petitioner's age exceeded restrictions at both Chicago and Northwestern.  If Title IX prohibits only purposeful discrimination such as would violate the Constitution were state action involved, a conclusion that seems forgone in light of our holding with respect to Title VI of the Civil Rights Act of 1964 in *University of California Regents* v. *Bakke,* 438 U. S., at 284–287 (opinion of Powell, J.); *id.,* at 328–350 (opinion of Brennan, White, Marshall, and Blackmun, JJ.), then the chances of petitioner's proving that the neutral age requirements used by Chicago and Northwestern are unlawful seem infinitesimal.  Yet these schools have been forced to use their scarce resources to defend against this suit at three levels of our federal judicial system, and in light of the Court's holding today they must contend with at least one more round of proceedings.

crimination in federally funded colleges and universities will not be countenanced.  The current position of the Government notwithstanding,[20] overlapping judicial and administrative enforcement of these policies inevitably will lead to conflicts and confusion; our national goal of equal opportunity for men and women, as well as the academic community, may suffer.   A federal court should resolve all doubts against this kind of self-aggrandizement, regardless of the temptation to lend its assistance to the furtherance of some remedial end deemed attractive.

## III

In sum, I believe the need both to restrain courts that too readily have created private causes of action, and to encourage Congress to confront its obligation to resolve crucial policy questions created by the legislation it enacts, has become compelling.  Because the analysis suggested by *Cort* has proved inadequate to meet these problems, I would start afresh.   Henceforth, we should not condone the implication of any private action from a federal statute absent the most compelling evidence that Congress in fact intended such an action to exist.   Where a statutory scheme expressly provides for an alternative mechanism for enforcing the rights and duties created, I would be especially reluctant ever to permit a federal court to volunteer its services for enforcement purposes.   Because the Court  today is enlisting the federal judiciary in just such an enterprise, I dissent.

---

[20] See Brief for Federal Respondents 58–60, n. 36.